**2022 IL 127177**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

---

(Docket No. 127177)

WALWORTH INVESTMENTS-LG, LLC, Appellee, v.
MU SIGMA, INC., *et al.*, Appellants.

*Opinion filed November 28, 2022.*

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Anne M. Burke, Neville, Michael J. Burke, Carter, and Holder White concurred in the judgment and opinion.

## OPINION

¶ 1    Walworth Investments-LG, LLC, a former stockholder, brought this action against Mu Sigma, Inc. (Mu Sigma), a privately held data analytics company, and Dhiraj C. Rajaram, the company's founder, chief executive officer (CEO), and chairman of its board of directors (collectively, defendants), alleging that after reaping the benefits of plaintiff's $1.5 million investment and reputational capital,

defendants embarked on a fraudulent scheme to oust plaintiff of its substantial ownership interest in the company.

¶ 2       The Cook County circuit court disposed of plaintiff's claims as a matter of law, dismissing plaintiff's second amended complaint on the primary basis that the parties' stock repurchase agreement (SRA), which included antireliance and general release provisions, barred plaintiff's causes of action.

¶ 3       The appellate court reversed and remanded for further proceedings, holding, *inter alia*, that the antireliance language found in the SRA was ambiguous and therefore did not bar plaintiff's claims as a matter of law. For the reasons that follow, we reverse the appellate court's judgment and affirm the circuit court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5       In 2005, Rajaram, as founder and CEO, incorporated Mu Sigma. Mu Sigma was incorporated in Delaware and is headquartered in Northbrook, Illinois. The next year, plaintiff, an investment company acting on behalf of a prominent Chicago family, purchased shares of series B preferred stock from Mu Sigma for $1.5 million, an implied per share value of $0.68. Upon execution of an initial investment agreement, plaintiff became the sole holder of series B preferred stock, reflecting an approximate 21% ownership stake in the company, and the single largest outside investor in Mu Sigma at that time.

¶ 6       According to plaintiff, this investment significantly aided Mu Sigma's growth over the next few years. For example, in 2007, Mu Sigma generated revenues of $4.2 million—almost 20 times the company's revenues only two years earlier. In December 2008, Mu Sigma generated gross revenues totaling nearly $14 million, which was more than 60 times the company's gross revenues of $219,000, generated the year before plaintiff invested. Additionally, as a result of plaintiff's reputational capital, Mu Sigma developed an elite clientele, which included companies like Dell, Microsoft, and WalMart, among others.

¶ 7       In August 2008, Mu Sigma raised an additional $15 million through the sale of newly created shares of class C preferred stock for $1.72 per share. Mu Sigma also

repurchased some of Rajaram's stock shares for the same price. Around that time, plaintiff also acquired additional shares of series B preferred stock. Plaintiff and Mu Sigma also entered into a new investor rights agreement, which provided that Mu Sigma would, upon request, provide to plaintiff periodic and annual financial reports reflecting the company's performance. According to plaintiff, when it made this request, Rajaram instructed Mu Sigma's chief financial officer (CFO) to send the company's financial reports when they became available, and the CFO promised to do so "from now on."

¶ 8     According to plaintiff, in August 2009, Mu Sigma made an unsolicited offer to its investors, including plaintiff, to repurchase up to three million shares of its stock for $0.67 cents per share. Plaintiff alleged that the $0.67 price implied a valuation of approximately $31 million—down 61% from the $80 million valuation implied by the series C sale. According to plaintiff, there was nothing in Mu Sigma's financial reports explaining the sudden, dramatic decrease in the company's stock value, which was less than half the price Mu Sigma paid to repurchase Rajaram's stock shares the year before. In any event, plaintiff declined the repurchase offer.

¶ 9     In mid-March 2010, Rajaram again approached plaintiff about repurchasing its stock shares. According to plaintiff, Rajaram told it that Mu Sigma would no longer experience explosive growth and instead would have to rely on acquisitions to replace the company's organic growth. According to plaintiff, Rajaram claimed that Mu Sigma's business had changed and that it was time for plaintiff to sell, warning that there was "no upside left" for the company. According to plaintiff, against this backdrop, Rajaram expressed the view that Mu Sigma would not "be his big success" and thus invited plaintiff to be "lead investors in [his] next company."

¶ 10     According to plaintiff, Rajaram represented that he was planning to offer a $1.20 per share value to "early investors *** to buy their shares back into the company," and Mu Sigma's counsel expressed that its repurchase offer was intended to apply to "one or a small number of stockholders." According to Rajaram, the impending loss of Mu Sigma's largest customer, IMS Health, was a harbinger of the company's grim future prospects, and given the economic and political environments facing Mu Sigma and its potential clients, Mu Sigma was unlikely to acquire new customers to replace the lost revenue.

¶ 11    Plaintiff alleged that Rajaram's statements and omissions of information induced it to enter the SRA, after approximately two months' negotiation, on May 27, 2010. Pursuant to the SRA executed by plaintiff and defendants, Mu Sigma purchased all of plaintiff's 7,764,705 shares of series B preferred stock at $1.20 per share, for a total of $9,317,646. The SRA contained provisions wherein plaintiff agreed that (1) it had received the information it deemed necessary to decide whether to sell the stock, (2) defendants had not made any representations outside the SRA, (3) it released and discharged defendants from any known or unknown claims, (4) the SRA contained the complete agreement and understanding between the parties and superseded any prior understandings, and (5) the SRA would be governed by Delaware law.

¶ 12    Specifically, the SRA provided as follows:

> "3. Representations and Warranties of Stockholder. Stockholder represents and warrants that:
>
> * * *
>
> (e) Disclosure of Information. Stockholder has received all the information it considers necessary or appropriate for deciding whether to sell the Repurchased Stock to the Company pursuant to this Agreement. Stockholder acknowledges (i) that neither the Company, nor any of the Company's Related Parties (as defined below), has made any representation or warranty, express or implied, except as set forth herein, regarding any aspect of the sale and purchase of the Repurchased Stock, the operation or financial condition of the Company or the value of the Repurchased Stock and (ii) that the Company is relying upon the truth of the representations and warranties in this Section 3 in connection with the purchase of the Repurchased Stock hereunder.
>
> * * *
>
> 4. Representations and Warranties of the Company. The Company represents and warrants that:
>
> * * *

- 4 -

(d) Disclosure of Information. The Company is not currently engaged in any discussions or conversations with any third parties which the Company has reason to believe would directly or indirectly result in the sale or issuance of any capital stock of the Company at an implied valuation or purchase price greater than the implied valuation of the Repurchased Stock. The Company acknowledges that Stockholder is relying upon the truth of the representations and warranties in this Section 4 in connection with the sale of the Repurchased Stock hereunder."

¶ 13        Next, the SRA's release provision, found in section 5, provided:

"5. Release. Stockholder hereby forever generally and completely releases and discharges the Company and its Related Parties and their respective successors and assigns from any and all claims, liabilities, obligations and demands of every kind and nature, in law, equity or otherwise, known and unknown, suspected and unsuspected, disclosed and undisclosed, and in particular of and from all claims and demands of every kind of nature, known and unknown, suspected and unsuspected, disclosed and undisclosed, that arose out of or are in any way related to events, acts, conduct or omissions occurring prior to the date of this Agreement; provided, however, that the foregoing release shall not apply to claims relating to Stockholder's right to payment by the Company."

¶ 14        The SRA further provided:

"6. Miscellaneous.

***

(b) This Agreement shall be construed in accordance with, and governed in all respects by, the laws of the State of Delaware (without giving effect to principles of conflicts of laws).

* * *

- 5 -

(f) The representations and warranties set forth in this Agreement shall survive the execution of this Agreement regardless of any investigation or lack of investigation by the parties to this Agreement.

(g) This Agreement contains the complete agreement and understanding between the parties as to the subject matter covered hereby and supersedes any prior understandings, agreements or representations by or between the parties, written or oral, which may have related to the subject matter hereof in any way."

The term "Related Parties" is defined in section 3(e) of the SRA to include Mu Sigma's officers, directors, stockholders, employees, and other company representatives, and it thus extends by its terms to Rajaram.

¶ 15 According to plaintiff, Rajaram's statements, made prior to the SRA's execution, were lies or, at best, intentionally misleading statements. Plaintiff alleged that, contrary to what Rajaram had stated, members of Mu Sigma's sales team understood that the loss of IMS Health as a client represented an opportunity for more organic growth, not a signal of declining business, in that parting ways with IMS Health allowed Mu Sigma to pursue IMS Health's previously off-limit clients.

¶ 16 According to plaintiff, Rajaram boasted in an internal April 2010 e-mail to his employees that Mu Sigma "represent[ed] the new order of what a new age services company [would] look like" and was "poised for explosive growth." Rajaram also told a potential Mu Sigma CFO that Mu Sigma was performing so well he expected its valuation to more than double in the next three years, stating: "[O]ur company should have a fair value of about $200MM today. *** I believe we can take it to about $500 MM in the next 3 years."

¶ 17 Plaintiff alleged that Mu Sigma was setting new records for growth in March 2010 and in April 2010 and maintained that growth throughout 2010 by bringing on more than 20 new name-brand clients, expanding the size of its sales team, and focusing nonsales employees on expanding revenues and clients. According to plaintiff, Mu Sigma's documents indicate that 2010 was the company's highest growth year between 2008 and 2013.

¶ 18      Plaintiff alleged that, beyond mischaracterizing the loss of the client and Mu Sigma's financial health, Rajaram also failed to disclose to plaintiff that he wanted to take Mu Sigma public in three to four years, valued the company at $200 million in April 2010—which would have corresponded to a purchase price of four times more than the $1.20 per share that the plaintiff received—and had no "next company" in mind that would represent a more lucrative investment for plaintiff.

¶ 19      In the months leading up the repurchase transaction, Rajaram instructed Mu Sigma's CFO to stop sending monthly investor reports to plaintiff. According to plaintiff, the March 2010 monthly revenue report that Rajaram withheld from plaintiff demonstrated that, for the first time in the company's history, monthly revenues had exceeded $3 million, every business unit was exceeding projections, and Mu Sigma was experiencing month-on-month growth of 16%. The April 2010 report similarly showed that the company had outperformed its first-quarter projections. Plaintiff alleged that it never received these reports, which contradicted Rajaram's dour portrayals of Mu Sigma's state of financial affairs.

¶ 20      A few months after the parties executed the SRA, plaintiff learned that Rajaram had been interviewed by the Chicago Sun-Times newspaper. Contrary to what Rajaram had told plaintiff, the Sun-Times reported that Rajaram predicted "huge growth" for Mu Sigma, estimating that the company would "double its revenues to $100 million *** in the next three years." When plaintiff confronted Rajaram about this inconsistency, however, he had no explanation.

¶ 21      Mu Sigma's growth far exceeded Rajaram's prediction for it in the Sun-Times. By 2015, Mu Sigma was generating more than $250 million in annual revenue and more than $125 million in annual cash profits. As of 2019, the company was estimated to be worth over $1.5 billion. According to plaintiff, had it not relinquished its stake, it would own Mu Sigma shares worth hundreds of millions of dollars.

¶ 22                          A. Circuit Court Proceedings

¶ 23      In 2016, plaintiff filed the instant suit. After the circuit court entered multiple piecemeal rulings, including reconsideration of prior rulings with regard to plaintiff's previous complaints, plaintiff filed its second amended complaint

containing six counts on April 23, 2019. Counts I through IV alleged plaintiff's previous claims for fraudulent inducement, fraudulent concealment, negligent misrepresentation, and breach of fiduciary duty. Specifically, in count I, plaintiff alleged that both defendants committed fraudulent inducement, based on Rajaram's false affirmative representations and omissions of material fact concerning the valuation and business prospects of the company, the client and contract pipeline, and Rajaram's motive and purpose for the transaction, to induce plaintiff into the repurchase transaction. In count II, plaintiff alleged both defendants committed fraudulent concealment, in that Rajaram, despite his fiduciary obligations, improperly omitted material facts relating to the SRA and actively concealed material facts relating to Mu Sigma's value. In count III, plaintiff alleged that both defendants committed negligent misrepresentation, in that Rajaram and Mu Sigma made false affirmative representations of material fact and omitted material facts concerning the valuation and business prospects of the company, the company's client and contract pipeline, and Rajaram's motive and purpose for the transaction.

¶ 24        In count IV, plaintiff alleged that Rajaram breached fiduciary duties owed to plaintiff. Plaintiff alleged that Rajaram breached his obligation of loyalty by acting in his own self-interest to the detriment of plaintiff as a stockholder and breached his obligation to fully and fairly disclose information to plaintiff. Plaintiff alleged that Rajaram made false and misleading statements and omissions of material information regarding the company's business prospects and value and the company's plans to conduct an initial public offering or other major strategic transaction.

¶ 25        In count V, plaintiff alleged that Mu Sigma breached the investor rights agreement, which was the separate contract between plaintiff and Mu Sigma, by failing to provide the financial statements and reports requested by plaintiff and by intentionally concealing such financial information from March 2010 to May 2010, the months leading up to the execution of the SRA. In count VI, plaintiff asserted an unjust enrichment claim, against both defendants, alleging that they acted in bad faith to intentionally deceive plaintiff, concealed material information that Rajaram had a fiduciary obligation to provide, and made material misstatements and omissions to induce plaintiff into the repurchase transaction. Plaintiff sought compensatory and punitive damages or, alternatively, rescission of the SRA.

¶ 26    On August 30, 2019, upon defendants' motion to dismiss pursuant to section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2018)), which allows a combined motion under sections 2-619 and 2-615 of the Code (*id.* §§ 2-615, 2-619), the circuit court dismissed with prejudice plaintiff's second amended complaint. In its order, the circuit court noted that all of the claims in plaintiff's first amended complaint had been dismissed or abandoned. The circuit court, applying Delaware law, held that the broad and comprehensive general release found in section 5 of the SRA, which was executed by sophisticated parties represented by experienced counsel, was unambiguous and worked to bar plaintiff's claims, all of which related to conduct leading up to the May 2010 SRA.

¶ 27    In its August 30, 2019, order, the circuit court noted that it had previously entered summary judgment in favor of defendants on the merits of plaintiff's fraud and fiduciary duty claims and that it had twice denied plaintiff's motions for reconsideration of those rulings, because plaintiff could not prove the essential element of reliance for those claims because of the antireliance language found in the SRA.[1] The circuit court thus reaffirmed that the antireliance language found in section 3(e) of the SRA, coupled with the general release language in section 5, sufficiently disclaimed plaintiff's reliance on defendant's alleged misrepresentations or omissions made outside the four corners of the SRA and, therefore, sufficiently barred plaintiff's fraudulent inducement, fraudulent concealment, negligent misrepresentation, and breach of fiduciary duty claims. The circuit court also found defendants did not owe plaintiff a fiduciary duty of full disclosure, because the duty only attaches to a "request for shareholder action" and this case involved an individually negotiated transaction.

---

[1]On October 9, 2018, the circuit court granted defendants' motion to reconsider a previous March 29, 2018, order denying defendants' motion for partial summary judgment and granted summary judgment in favor of defendants as to counts I (fraudulent inducement), II (fraudulent concealment), and III (negligent misrepresentation) of plaintiff's first amended complaint. The circuit court found that, pursuant to the SRA language, plaintiff disclaimed its reliance on extracontractual statements, barring these claims. On April 2, 2019, on the parties' motions for reconsideration of the court's October 9, 2018, order, the circuit court granted defendants' motion for reconsideration, finding plaintiff's breach of fiduciary duty claim also barred by the SRA language. In this order, the circuit court granted plaintiff's motion for leave to file a second amended complaint.

- 9 -

¶ 28 Noting that section 4(d) of the SRA included the representation that Mu Sigma was not engaged in any discussions with any third parties it had reason to believe would result in the sale of any capital stock at an implied valuation greater than the implied valuation of the repurchased stock, the circuit court noted that the parties could simply have expanded section 4(d) to include Mu Sigma's misrepresentations alleged here.

¶ 29 In its August 30, 2019, order, the circuit court further addressed plaintiff's argument that a "fiduciary exception" rendered the SRA's release language unenforceable absent disclosure of any misconduct or claims the release would purportedly cover. The circuit court held that plaintiff's fiduciary exception argument could not rescue its breach of contract claim or its unjust enrichment claim against Mu Sigma because Mu Sigma did not owe plaintiff a fiduciary duty. See *In re Wayport, Inc. Litigation*, 76 A.3d 296, 322-23 (Del. Ch. 2013) (corporation owes no fiduciary duties to its shareholders; only officers or directors do).[2]

¶ 30 The circuit court further held that plaintiff could not avoid application of the release with regard to Rajaram. The circuit court distinguished *Xy Hong Bin v. Heckmann Corp.*, No. 4637-CC, 2009 WL 3440004, at *7 (Del. Ch. Oct. 26, 2009) (Delaware law requires a director to make full disclosure of his interest in a transaction before engaging in that transaction with the corporation),[3] holding that *Heckmann* did not apply to an arm's-length transaction between a corporation and a shareholder. Enforcing the release terms as written, the circuit court dismissed with prejudice plaintiff's breach of contract claim for the alleged breach of the 2008 investor rights agreement and plaintiff's unjust enrichment claim.

¶ 31 B. Appellate Court Proceedings

---

[2]"Delaware has long been recognized as the fountainhead of American corporations and *** its Courts of Chancery are known for their expert exposition of corporate law." *In re Ivan F. Boesky Securities Litigation*, 129 F.R.D. 89, 97 (S.D.N.Y. 1990).

[3]"Delaware courts give [unpublished Court of Chancery] opinions substantial precedential weight." *Crystallex International Corp. v. Petróleos de Venezuela, S.A.*, 879 F.3d 79, 85 n.8 (3d Cir. 2018); see also *Case Financial, Inc. v. Alden*, No. 1184-VCP, 2009 WL 2581873, at *6 n.39 (Del. Ch. Aug. 21, 2009) (unpublished opinions in Delaware "have precedential value").

- 10 -

¶ 32    Plaintiff appealed, contending that the circuit court erred in dismissing its claims against defendants because the SRA contained no clear, unambiguous, antireliance provision and the SRA's general release provision was therefore unenforceable as a product of fraud. 2021 IL App (1st) 191937, ¶ 25. Noting that the parties agreed that Delaware law governed the issues on appeal, the appellate court found absent from the SRA an unqualified disclaimer from plaintiff's point of view that it did not rely on the extracontractual statements allegedly made by defendants. *Id.* ¶¶ 35-36. Accordingly, the appellate court concluded that the SRA's language was ambiguous as to which party, if any, disclaimed reliance, considered extrinsic evidence of an earlier draft of section 3(e) and of Rajaram's internal e-mails, and determined that whether the SRA was enforceable or fraudulently procured was a question of fact for a jury to decide. *Id.* ¶ 45.

¶ 33    The appellate court addressed whether Rajaram had a fiduciary duty to disclose all information that was material to the stock repurchase transaction. *Id.* ¶ 53. The appellate court held that the suggestion that defendants intended to extend their repurchase offer to an unspecified number of other stockholders raised a question of fact as to whether the repurchase was an individual transaction or part of a larger request for stockholder action. *Id.* ¶ 54. Citing *Dohmen v. Goodman*, 234 A.3d 1161, 1168 (Del. 2020), the appellate court explained that, if the director requested stockholder action but failed to disclose material facts bearing on that request, then the SRA's reliance clause was not applicable because, in such a circumstance, plaintiff need not prove reliance as an element of its breach of fiduciary duty claim in order to recover nominal damages. 2021 IL App (1st) 191937, ¶ 52. The appellate court held that, because it concluded that there was a genuine issue of material fact regarding whether the repurchase transaction was part of a request for shareholder action, there remained genuine issues of material fact with regard to plaintiff's fraudulent inducement, fraudulent concealment, negligent misrepresentation, and breach of fiduciary duty claims. *Id.* ¶ 56.

¶ 34    The appellate court also concluded that the circuit court erred in dismissing plaintiff's claims for breach of contract and unjust enrichment based on the SRA's release provision. *Id.* ¶ 58. The appellate court held that, because the enforceability of the general release provision depended upon whether plaintiff's fraud claims were successful, the dismissal of plaintiff's breach of contract and unjust enrichment claims was premature. *Id.* ¶ 64.

¶ 35    Accordingly, the appellate court "reverse[d] the circuit court's summary judgment ruling in favor of defendants on plaintiff's fraudulent inducement, fraudulent concealment, negligent misrepresentation, and breach of fiduciary duty claims" and remanded the cause for further proceedings. *Id.* ¶ 70. In addition, the appellate court reversed the circuit court's judgment dismissing plaintiff's breach of contract and unjust enrichment claims and remanded the cause for further proceedings. *Id.* Justice Pucinski specially concurred, opining that the majority's decision went too far into the trier of fact's realm when discussing the parole evidence. *Id.* ¶ 73 (Pucinski, J., specially concurring).

¶ 36    On September 29, 2021, this court allowed defendants' petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2020). This court also allowed the Northwestern University Pritzker School of Law Bluhm Legal Clinic Complex Civil Litigation and Investor Protection Center, the University of Pittsburgh School of Law Securities Arbitration Clinic, and the Illinois Trial Lawyers' Association leave to file briefs as *amici curiae* in support of plaintiff's position. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 37                                    II. ANALYSIS

¶ 38    The circuit court found that the express language of the SRA barred plaintiff's claims in its second amended complaint. In the circuit court, defendants filed a motion to dismiss plaintiff's second amended complaint pursuant to section 2-619.1 of the Code. 735 ILCS 5/2-619.1 (West 2018). Section 2-619.1 motions may be granted where a defendant raises an affirmative defense or other matter that defeats the plaintiff's claim as a matter of law or based on an easily proved issue of fact. *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 115-16 (1993).

¶ 39    Section 2-619.1 of the Code allows defendants to combine a section 2-615 motion to dismiss (735 ILCS 5/2-615 (West 2018)) with a section 2-619 motion to dismiss (*id.* § 2-619). Pursuant to section 2-615 of the Code, the movant challenges the legal sufficiency of a complaint based on certain defects or defenses apparent on the face of the complaint. *Beacham v. Walker*, 231 Ill. 2d 51, 57 (2008). In ruling on a section 2-615 motion, a court must accept as true all well-pleaded facts and all reasonable inferences therefrom, to determine whether the complaint's allegations—construed in the light most favorable to the plaintiff—are sufficient to

establish a cause of action upon which relief may be granted. *Vitro v. Mihelcic*, 209 Ill. 2d 76, 81 (2004).

¶ 40        Section 2-619 of the Code permits dismissal where "the claim asserted *** is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2018). "The phrase 'affirmative matter' encompasses any defense other than a negation of the essential allegations of the plaintiff's cause of action." *Kedzie & 103rd Currency Exchange, Inc.*, 156 Ill. 2d at 115. "For that reason, it is recognized that a section 2-619(a)(9) motion to dismiss admits the legal sufficiency of the plaintiff's cause of action much in the same way that a section 2-615 motion to dismiss admits a complaint's well pleaded facts." *Id.* We review *de novo* an appeal from the dismissal of a complaint pursuant to section 2-615 or 2-619 of the Code. *Id.* at 116; see also *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998) (motion to dismiss complaint presents question of law and is subject to *de novo* review by court on appeal, where court must accept as true all well-pleaded allegations of fact). We also review *de novo* a circuit court's ruling on a motion for summary judgment, where the court determines whether the pleadings, depositions, and admissions on file, together with the affidavits, if any, evidence that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018); *Kedzie & 103rd Currency Exchange*, 156 Ill. 2d at 116.

¶ 41        In this case, the plain language of the SRA provides that it be construed and governed by Delaware law. Moreover, because Mu Sigma was incorporated in Delaware, Delaware law governs Rajaram's fiduciary obligations to Mu Sigma's stockholders. See *Prime Leasing, Inc. v. Kendig*, 332 Ill. App. 3d 300, 314 n.1 (2002) (pursuant to Illinois choice-of-law principles, fiduciary duty claims are governed by the law of the state of incorporation).

¶ 42                    A. The SRA's Antireliance Language

¶ 43        Counts I through IV of plaintiff's second amended complaint allege claims for fraudulent inducement, fraudulent concealment, negligent misrepresentation, and breach of fiduciary duty. To state a claim for common-law fraud, plaintiff must plead facts supporting an inference that

- 13 -

"(1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) *the plaintiff acted in justifiable reliance on the representation*; and (5) the plaintiff was injured by its reliance." (Emphasis added.) *Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

¶ 44    Accordingly, under Delaware law, plaintiff's claims of fraudulent inducement, fraudulent concealment, and negligent misrepresentation require the element of plaintiff's reliance. *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987) ("[t]o establish a prima facie case of intentional representation (fraudulent concealment)," plaintiff must prove "[a]n intent to induce plaintiff's reliance upon the" defendant's deliberate concealment); *Stephenson v. Capano Development, Inc.*, 462 A.2d 1069, 1074 (Del. 1983) (at common law, fraud or deceit requires proof of plaintiff's action or inaction taken in justifiable reliance upon the misrepresentation); *Vichi v. Koninklijke Philips Electronics, N.V.*, 85 A.3d 725, 822 (Del. Ch. 2014) (to recover on a negligent misrepresentation claim, plaintiff must prove that it "suffered a pecuniary loss caused by justifiable reliance upon the false information"). Likewise, plaintiff's claim for breach of fiduciary duty generally requires the plaintiff to prove reliance. *Dohmen*, 234 A.3d at 1175 ("to recover compensatory damages, an investor who proves a breach of the fiduciary duty of disclosure must prove reliance, causation, and damages").

¶ 45    The circuit court in this case determined that the antireliance language in the SRA, wherein plaintiff stated that it had received all the information it considered necessary and that the defendants had not made any representation or warranty, express or implied, except as set forth in the SRA, barred counts I through IV of plaintiff's second amended complaint. However, the appellate court concluded that the SRA's language did not unambiguously disclaim reliance on extracontractual statements or omissions and did not bar plaintiff's fraud and fiduciary duty claims. We therefore first review the language of the parties' SRA.

¶ 46    "Delaware adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable

- 14 -

third party." (Internal quotation marks omitted.) *Estate of Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010). Courts must read a contract as a whole, giving each provision effect, so as not to render any part of the contract mere surplusage. *Id.* Courts must not read a contract to render a provision illusory or meaningless. *Id.* When a contract is clear and unambiguous, courts must give effect to the plain language of the contract's provisions. *Id.* at 1159-60.

¶ 47 A Delaware court will thus "give priority to the parties' intentions as reflected in the four corners of the agreement." (Internal quotation marks omitted.) *Riverbend Community, LLC v. Green Stone Engineering, LLC*, 55 A.3d 330, 334 (Del. 2012). "When interpreting a contract, the role of a court is to effectuate the parties' intent," and to do so, the court is "constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended." *Lorillard Tobacco Co. v. American Legacy Foundation*, 903 A.2d 728, 739 (Del. 2006).

¶ 48 Pursuant to Delaware law, "[a] contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Insurance Co.*, 616 A.2d 1192, 1196 (Del. 1992). Moreover, a mere split in the case law concerning the construction of a contract does not render the contract's meaning ambiguous in the Delaware courts. *O'Brien v. Progressive Northern Insurance Co.*, 785 A.2d 281, 289 (Del. 2001). Under Delaware law, a contract is rendered ambiguous "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chemicals Co.*, 616 A.2d at 1196. Courts should not "torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty." *Id.* Where "a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract[,] or to create an ambiguity." *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

¶ 49 Defendants argue that by agreeing in the SRA that Mu Sigma had made no representations about its financial condition or the value of its stock, except as set forth in the SRA itself, plaintiff disclaimed reliance on any extracontractual representations. Defendants thus argue that, under Delaware's clearly stated policy of enforcing written antireliance provisions, the circuit court correctly ruled that

plaintiff's claims requiring the element of reliance were barred as a matter of law. Defendants argue that the appellate court erred in refusing to enforce the antireliance language in the SRA, considering that such provisions have been routinely enforced by Delaware courts. Plaintiff counters that the language of section 3(e) of the SRA does not satisfy Delaware's heightened standard for explicit antireliance language because it does not contain an unqualified disclaimer from plaintiff's point of view that it did not rely on the extracontractual statements allegedly made by defendants.

¶ 50      Delaware law enforces clauses identifying the information on which a party has relied and foreclosing reliance on other information. *RAA Management, LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 116-17 (Del. 2012). Delaware law attempts to strike the appropriate balance between holding sophisticated parties to the terms of their contract and simultaneously protecting against the abuses of fraud. *Abry Partners*, 891 A.2d at 1061-62 ("the common law ought to be especially chary about relieving sophisticated business entities of the burden of freely negotiated contracts").

¶ 51      "[S]ophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a part of the basis for their decision to contract." (Internal quotation marks omitted.) *Id.* at 1056. To bar a contracting party from later asserting claims for fraud based on representations outside the contract's four corners, the contract must reveal that the aggrieved party unambiguously disclaimed reliance on such statements. *FdG Logistics LLC v. A&R. Logistics Holdings, Inc.*, 131 A.3d 842, 860 (Del. Ch. 2016). "[T]he disclaimer must come from the point of view of the aggrieved party [(the party claiming fraud and not the party accused of fraud)] *** to ensure the preclusion of fraud claims for extra-contractual statements." *Id.*

¶ 52      Accordingly, for a contract to bar fraud in the inducement claims, the contract's language, when read together, must "add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract." *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004). Murky or standard integration clauses without explicit antireliance language "will not relieve a party of its oral and extra-contractual fraudulent representations." *Abry Partners*, 891 A.2d at 1059.

¶ 53    Delaware courts "have honored clauses in which contracted parties have disclaimed reliance on extra-contractual representations, which prohibits the promising party from reneging on its promise by premising a fraudulent inducement claim on statements of fact it had previously said were neither made to it nor had an effect on it." *Id.* at 1056 (fraud claims based on representations made outside of agreement can be disclaimed through nonreliance language) (citing *Homan v. Turoczy*, No. Civ.A. 19220, 2005 WL 2000756, at \*16-17 (Del. Ch. 2005), *Kronenberg*, 872 A.2d at 591-93, *aff'd*, 867 A.2d 902 (Del. 2005), *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 142 (Del. Ch. 2003), *Progressive International Corp. v. E.I. DuPont de Nemours & Co.*, No. C.A. 19209, 2002 WL 1558382, at \*7 (Del. Ch. July 9, 2002), *Great Lakes Chemical Corp. v. Pharmacia Corp.*, 788 A.2d 544, 555 (Del. Ch. 2001), and *MBIA Insurance Corp. v. Royal Indemnity Co.*, 426 F.3d 204, 218 (3d Cir. 2005) (applying Delaware law and predicting that "when sophisticated parties have inserted clear anti-reliance language \*\*\* Delaware's highest court will enforce it to bar a subsequent fraud claim")). "Delaware law does not require magic words" to disclaim reliance, and the specific language of an agreement may vary but still "add up to a clear anti-reliance clause." *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 51 (Del. Ch. 2015).

¶ 54    In this case, pursuant to Delaware law, the integration provision found in section 6(g) of the SRA, stating that the SRA contained "the complete agreement and understanding between the parties as to the subject matter covered hereby and supersedes any prior understandings, agreements or representations by or between the parties, written or oral, which may have related to the subject matter hereof in any way," may have been insufficient, alone, to disclaim reliance upon defendants' extracontractual statements. *Abry Partners*, 891 A.2d at 1059 ("standard integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations"); *Kronenberg*, 872 A.2d at 574-75 (standard integration clause alone will not preclude fraud in the inducement claims). However, section 6(g)'s integration clause, in combination with the clear language in subsection (i) of section 3(e) of the SRA, stating that plaintiff "ha[d] received all the information it consider[ed] necessary or appropriate for deciding whether to sell the Repurchased Stock to the Company" and that defendants had made no "representation or warranty, express or implied, except as set forth [in the SRA], regarding any aspect of the sale[,] and purchase of the Repurchased Stock, the operation or financial condition of the Company or the value of the Repurchased

Stock," add up to clear antireliance language. The parties here were sophisticated parties represented by counsel. Yet, in its second amended complaint, plaintiff pleaded allegations of fraud in the inducement based on Rajaram's extracontractual statements, made to plaintiff before it entered the SRA. If plaintiff had relied on statements made outside of the SRA, it should not have signed an agreement expressly stating that no such representations had been made to it. See *H-M Wexford LLC*, 832 A.2d at 142 n.18 (Delaware law has consistently held that a sophisticated party to a negotiated commercial contract may not reasonably rely on information it contractually agreed did not form the basis for the contract).

¶ 55 Section 3(e)(ii) further put forth that Mu Sigma was relying on plaintiff's acknowledgement that neither it nor any of its related parties had made any representation except as set forth in the SRA. Thus, the SRA, considered as a whole, reveals a clear disclaimer of reliance by the plaintiff on extracontractual statements made by defendants. *Collab9, LLC v. En Pointe Technologies Sales, LLC*, No. C.A. N16C-12-032 MMJ CCLD, 2019 WL 4454412, at *5 (Del. Super. Ct. Sept. 17, 2019) (combined integration and antireliance language where each party acknowledged that neither made any representations that survived execution of agreement, except for those expressly set forth in agreement, expressed intent to preclude reliance on representations made prior to effective date of agreement and barred fraud claims); *ChyronHego Corp. v. Wight*, No. 2017-0548-SG, 2018 WL 3642132, at *5, *7 (Del. Ch. July 31, 2018) (provision stating the plaintiff agreed that the defendant had made no representations other than those set forth in the agreement, read in conjunction with integration clause, expressed intent to preclude reliance on extracontractual statements and barred fraud claims because language constituted "a clear statement that no extra-contractual representations were relied upon by the parties").

¶ 56 The antireliance language circumscribes the universe of representations Mu Sigma made to plaintiff concerning the financial condition of the company and the value of the repurchased stock to only representations Mu Sigma made in the SRA itself. Moreover, the SRA also contains a general release in which plaintiff released defendants from all claims, "known and unknown," that "arose out of or are in any way related to events, acts, conduct[,] or omissions occurring prior to the date of" the SRA. See *IAC Search, LLC v. Conversant LLC*, No. 11774-CB, 2016 WL 6995363, at *7 (Del. Ch. Nov. 30, 2016) (noting that the presence of a release

further reinforces the effect of antireliance language). Considering that "Delaware law does not require magic words" to disclaim reliance, we find that the specific language of the SRA "add[s] up to a clear anti-reliance clause" barring plaintiff's claims involving representations made outside of the SRA. See also *Prairie Capital*, 132 A.3d at 51 (combination of standard integration clause and clause representing affirmatively that buyer relied only on representations in the agreement added up to clear antireliance clause that barred fraud claims based on extracontractual statements).

¶ 57 Below, the appellate court declined to enforce the antireliance language in the SRA, holding that the language was not from plaintiff's point of view. 2021 IL App (1st) 191937, ¶¶ 35-36; see *FdG Logistics LLC*, 131 A.3d at 859. However, the SRA specifically provides in section 3, titled "Representations and Warranties of Stockholder," that plaintiff, as stockholder, "received all the information it consider[ed] necessary or appropriate" and that plaintiff, as stockholder, acknowledged "neither the [c]ompany, nor [its related parties], ha[d] made any representation or warranty, express or implied," except as set forth in the SRA "regarding any aspect of the sale and purchase of the Repurchased Stock, the operation or financial condition of the Company or the value of the Repurchased Stock." The clear language of the SRA belies the appellate court's holding.

¶ 58 Plaintiff argues that this court should decline to enforce the language of the SRA on policy grounds, arguing that defendants should be prohibited from using contracts to shield themselves from liability for their own fraud. Yet, the Supreme Court of Delaware has affirmed Delaware's public policy in favor of enforcing contractually binding, written disclaimers of reliance on representations outside of a final sale agreement:

> "[A] party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those representations' fraudulent inducement claim. The policy basis for this line of cases is *** quite strong. If there is a public policy interest in truthfulness, then that interest applies with more force, not less, to contractual representations of fact. Contractually binding, written representations of fact ought to be the most reliable of

representations, and a law intolerant of fraud should abhor parties that make such representations knowing they are false.

To fail to enforce non-reliance clauses is not to promote a public policy against lying. Rather, it is to excuse a lie made by one contracting party in writing—the lie that it was relying only on contractual representations and that no other representations had been made—to enable it to prove that another party lied orally or in a writing outside the contract's four corners. For the plaintiff in such a situation to prove its fraudulent inducement claim, it proves itself not only a liar, but a liar in the most inexcusable of commercial circumstances: in a freely negotiated written contract. Put colloquially, this is necessarily a 'Double Liar' scenario. To allow the buyer to prevail on its claim is to sanction its own fraudulent conduct." *Abry Partners*, 891 A.2d at 1057-58 (cited with approval by *RAA Management, LLC*, 45 A.3d at 117).

¶ 59 Plaintiff represented in writing that no representations were made to it regarding Mu Sigma's operation, financial condition, or value other than as set forth in the SRA itself, that it had received all the information it considered necessary and appropriate for deciding whether to sell the stock, that it understood that the defendants were relying upon its acknowledgement that no outside representations had been made to it, that the SRA contained the complete agreement as to the subject matter and superseded any prior written or oral agreement related to the subject matter, and that it was releasing defendants from any and all claims that arose out of or were in any way related to events occurring prior to the date of the SRA. However, here, plaintiff seeks to bring fraud in the inducement claims, alleging that there were additional representations about Mu Sigma's operation, financial condition, and stock value upon which it relied prior to entering into the SRA. To allow plaintiff to prevail on these claims would be to sanction fraudulent conduct. See *id.* at 116-17 (in accordance with *ratio decidendi* of *Abry Partners*, claim must be barred by the nonreliance disclaimer and waiver provisions in the agreement).

¶ 60 Plaintiff argues that, even if the parties' SRA contains sufficient antireliance language to preclude its claims for Rajaram's overt misrepresentations, it did not unambiguously disclaim plaintiff's reliance on information defendants

intentionally omitted or concealed to induce the repurchase transaction. Plaintiff asserts that its fraud and breach of fiduciary duty claims are premised in part on defendants' actionable omissions and their intentional concealment of Mu Sigma's investor reports, among other things. To support its position, plaintiff cites *TransDigm Inc. v. Alcoa Global Fasteners, Inc.*, No. 7135-VCP, 2013 WL 2326881, at *7-9 (Del. Ch. May 29, 2013), wherein the Delaware Court of Chancery denied a motion to dismiss a fraudulent, active concealment claim on the basis that the antireliance provision at issue did not disclaim reliance on extracontractual omissions.

¶ 61    Defendants counter that plaintiff cannot evade an antireliance clause's effect by pleading reliance on purported omissions that amount to recharacterized extracontractual statements. To support their position, defendants cite *Prairie Capital*, 132 A.3d at 54, wherein the Delaware Court of Chancery declined to follow *TransDigm* and held that the antireliance language in the agreement barred fraud claims based on both overt misrepresentations and omissions, even though the language did not expressly state that the buyer was not relying on omissions.

¶ 62    Delaware law establishes that fraud may occur in three ways: (1) an overt misrepresentation, (2) an omission in the face of a duty to speak, or (3) deliberate concealment of a material fact. *Stephenson*, 462 A.2d at 1074. "A claim of fraud based on active concealment does not require a showing that the defendant had a pre-existing duty to speak." *TransDigm*, 2013 WL 2326881, at *6.

¶ 63    In *Prairie Capital*, the Delaware Court of Chancery held that a stock purchase agreement's provision, providing that the buyer relied only on representations and warranties in the agreement, in combination with the agreement's integration clause providing that the agreement superseded all prior agreements, foreclosed claims of fraud based on extracontractual misrepresentations. 132 A.3d at 50. As an alternative means of avoiding the agreement's language, the buyer argued that its fraudulent omission and concealment claims survived. *Id.* at 51.

¶ 64    The Delaware court in *Prairie Capital* noted that, absent a special relationship, a party is under no duty to disclose facts of which he knows the other party is ignorant even if he knows the other party would consider the omitted facts material in determining its course of action in the transaction. *Id.* at 52. The court held that, because parties in an arm's-length contractual setting "begin[ ] the process without

any affirmative duty to speak, any claim of fraud" "cannot start from an omission." *Id.* "[T]herefore, contractual provisions that identify the representations on which a party exclusively relied define the universe of information that is in play for purposes of a fraud claim." *Id.* The court explained that "[t]he critical distinction is not between misrepresentations and omissions, but between information identified in the written agreement and information outside of it." *Id.*

¶ 65     In *Prairie Capital*, the Delaware court disagreed with the *TransDigm* court's reasoning that a clause must expressly refer to omissions to bar a fraudulent omissions claim. *Id.* at 54; see also *Universal American Corp. v. Partners Healthcare Solutions Holdings, L.P.*, 176 F. Supp. 3d 387, 400-02 (Dist. Ct. Del. 2016) (holding an antireliance clause barred claims for both fraudulent representations and omissions even though the clause did not expressly refer to omissions). The court held that recasting allegations of an overt misrepresentation "as an omission should not enable a party to circumvent an agreed-upon informational definition." *Prairie Capital*, 132 A.3d at 54.

¶ 66     The Delaware court in *Prairie Capital* explained:

> " 'Every misrepresentation, to some extent, involves an omission of the truth….' [Citation.] Consequently, any misrepresentation can be re-framed for pleading purposes as an omission. If a plaintiff could escape a provision like [antireliance provisions] by re-framing an extra-contractual misrepresentation as an omission, then the clause would be rendered nugatory. When parties identify a universe of contractually operative representations in a written agreement, they remain in that universe. A party that is later disappointed with the written agreement cannot escape through a wormhole into an alternative universe of extra-contractual omissions." *Id.* at 52-53.

¶ 67     Accordingly, "[i]f the contract says that the buyer only relied on the representations in the four corners of the agreement, then that is sufficient." *Id.* at 54-55. "The party may prove that the representations in the four corners of the agreement were false or materially misleading, but the party cannot claim that information it received outside of the agreement, which was not the subject of a contractual representation, contained material omissions." *Id.* at 55.

¶ 68       Defendants argue that the alleged misrepresentations at issue here involved statements to the effect that Mu Sigma's "growth prospects had severely dimmed" and that plaintiff's "omissions" claim is, in effect, that Rajaram failed to convey that Mu Sigma's growth prospects had not severely dimmed, which is merely a recharacterization of its misrepresentation claim. In this respect, we agree with defendants. The majority of plaintiff's omission claims, including plaintiff's allegations regarding Rajaram's stated misrepresentations and omissions of fact involving the valuation and business prospects of the company, the client and contract pipeline, and the motive and purpose for the transaction, are recharacterized misrepresentation claims that are barred by the provisions of the SRA's antireliance provisions. Although plaintiff's claim found in count II of its second amended complaint, that defendants actively concealed investment reports, which plaintiff was contractually entitled to receive and which included material facts relating to Mu Sigma's value, is somewhat akin to the circumstances in *TransDigm*, we nevertheless find *TransDigm* distinguishable.

¶ 69       In *TransDigm*, the Delaware Court of Chancery concluded that the fraudulent and active concealment claim at issue, which was based on alleged omissions, was not barred by the antireliance language in the stock purchase agreement. 2013 WL 2326881, at *8. The court did not find the antireliance language sufficient to disclaim the plaintiff-buyer's reliance on information that had been actively concealed, holding that the intentional and affirmative concealment of material facts did not constitute an extracontractual representation. *Id.* at *9. The buyer had alleged that, during the parties' negotiations, the seller failed to reveal and actively concealed the fact that a key customer intended to shift a large portion of its business to a competitor and had accepted a 5% price discount effective after the closing date. *Id.* at *1. The court found that the antireliance clause contained language expressly disclaiming reliance on overt representations, but in the absence of language disclaiming reliance on the omission of information or language that the company was making no representation as to the accuracy and completeness of the information, the court held that the fraudulent concealment and fraudulent omissions claims could proceed. *Id.* Notably, in *TransDigm*, the company's negotiation tactics included active concealment of material information that would have been responsive to the aggrieved party's request for information. *Id.* at *13.

¶ 70    Here, in count II of its second amended complaint, plaintiff alleged a cause of action for fraudulent concealment. Plaintiff alleged that, in the months leading up to the repurchase transaction, defendants actively concealed material facts, in that Rajaram explicitly instructed Mu Sigma's CFO to withhold vital financial reports from plaintiff, which plaintiff had previously requested pursuant to the investor rights agreement. According to plaintiff, the March 2010 monthly revenue report that Rajaram withheld from plaintiff demonstrated that, for the first time in the company's history, monthly revenues had exceeded $3 million, every business unit was exceeding projections, and Mu Sigma was experiencing month-on-month growth of 16%. Similarly, plaintiff alleged that the April 2010 monthly revenue report was improperly withheld from plaintiff and reflected that the company outperformed its projections in the first quarter of 2010. Plaintiff alleged that it never received these reports, which contradicted Rajaram's dour portrayals of Mu Sigma's state of financial affairs.

¶ 71    In *TransDigm*, as here, the agreement included language stating that the buyer had been provided with the information it had deemed necessary to enable it to make an informed decision with regard to the agreement. *Id.* at *9. The court in *TransDigm* held, however, that absent contrary language elsewhere in the agreement, the aggrieved party reasonably could have relied on the assumption that the company was not actively concealing information that was responsive to its inquiries and that the company was not engaged in a scheme to hide information material to the purchase. *Id. TransDigm* is distinguishable on this basis.

¶ 72    Plaintiff was aware that it had not received the investor reports pursuant to its previously negotiated investor rights agreement, yet it agreed in the SRA that it had "received all the information it consider[ed] necessary or appropriate for deciding whether to sell the Repurchased Stock to the Company." Moreover, here, plaintiff also expressly released claims based on "omissions," agreeing in the SRA to

> "hereby forever generally and completely release[ ] and discharge[ ] the Company and its Related Parties *** from any and all claims *** known and unknown, suspected and unsuspected, disclosed and undisclosed *** that arose out of or are in any way related to events, acts, conduct or *omissions* occurring prior to the date of this [a]greement." (Emphasis added.)

- 24 -

¶ 73    Delaware courts examine a contract in its entirety to determine if its provisions "add up to a clear anti-reliance clause." *Prairie Capital*, 132 A.3d at 51. No words are rendered mere surplusage. *Osborn*, 991 A.2d at 1159. Instead, the bargained-for antireliance provisions in the SRA reflected the understanding that there may be undisclosed information but that plaintiff was satisfied by the information provided. See *Progressive International Corp.*, 2002 WL 1558382. Accordingly, the SRA, construed as a whole, bars plaintiff's claims. Pursuant to its own binding contractual representations, plaintiff precluded its ability to reasonably rely on any statements or omissions by defendants that were not reduced to writing in the SRA.

¶ 74                                    B. Directors' Fiduciary Duties

¶ 75    Plaintiff argues that even if the parties' SRA contained sufficient antireliance language, thereby preventing plaintiff from proving that it relied on representations or omissions outside the SRA, such antireliance language would not be enforceable here in light of the parties' fiduciary relationship. To argue that Rajaram, as a director and CEO of Mu Sigma, owed a fiduciary duty of loyalty to plaintiff, as a stockholder, plaintiff cites *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) ("directors owe fiduciary duties of care and loyalty to the corporation and its shareholders"). Thus, plaintiff asks that we affirm the appellate court's judgment on this alternative ground.

¶ 76    "An underlying premise for the imposition of fiduciary duties is a separation of legal control from beneficial ownership." *Malone*, 722 A.2d at 9. "Equitable principles act in those circumstances to protect the beneficiaries who are not in a position to protect themselves." *Id.* "One of the fundamental tenets of Delaware corporate law provides for a separation of control and ownership." *Id.* Directors have the legal responsibility to manage the business of a corporation for the benefit of its shareholder owners. *Id.* "Accordingly, fiduciary duties are imposed on the directors of Delaware corporations to regulate their conduct when they discharge that function." *Id.* "The directors of Delaware corporations stand in a fiduciary relationship not only to the stockholders but also to the corporations upon whose boards they serve." *Id.* at 10. "The director's fiduciary duty to both the corporation and its shareholders has been characterized by this Court as a triad: due care, good faith, and loyalty." *Id.*

¶ 77    Accordingly, "Delaware corporate law starts from the bedrock principle that '[t]he business and affairs of every corporation *** shall be managed by or under the direction of a board of directors.' " *In re Trados Inc. Shareholder Litigation*, 73 A.3d 17, 36 (Del. Ch. 2013) (quoting Del. Code Ann. tit. 8, § 141(a) (2011)). "When exercising their statutory responsibility, the standard of conduct requires that directors seek 'to promote the value of the corporation for the benefit of its stockholders.' " *Id.* (quoting *eBay Domestic Holdings, Inc. v. Newmark*, 16 A.3d 1, 34 (Del. Ch. 2010)). By rendering decisions benefitting the corporation as a whole and by increasing the value of the corporation, "the directors increase the share of value available for the residual claimants." *Id.*

¶ 78    "Judicial opinions therefore often refer to directors owing fiduciary duties 'to the corporation and its shareholders.' " *Id.* (quoting *North American Catholic Educational Programming Foundation, Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007)). "This formulation captures the foundational relationship in which directors owe duties to the corporation for the ultimate benefit of the entity's residual claimants." *Id.* at 36-37. Directors must act loyally to advance the best interests of the corporation and "the stockholders in the aggregate in their capacity as residual claimants, which means the undifferentiated equity as a collective." *Frederick Hsu Living Trust v. ODN Holding Corp.*, No. 12108-VCL, 2017 WL 1437308, at *17 (Del. Ch. Apr. 14, 2017).

¶ 79    Nevertheless, Delaware law holds that "corporate directors do not owe fiduciary duties to individual stockholders; they owe fiduciary duties to the entity and to the stockholders as a whole." *Klaassen v. Allegro Development Corp.*, No. 8626-VCL, 2013 WL 5967028, at *11 (Del. Ch. Nov. 7, 2013); see, *e.g.*, *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985); *eBay Domestic Holdings, Inc.*, 16 A.3d at 34. A director's fiduciary duties run to the corporation and to the body of shareholders generally, as opposed to specific shareholders. *Frederick Hsu Living Trust*, 2017 WL 1437308, at *17 n.16 (citing J. Travis Laster & John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 Bus. Law. 33, 49 (2014) ("The reference [to fiduciary duties running] to 'stockholders' means all of the corporation's stockholders as a collective. It means the stockholders as a whole.")).

¶ 80    By example, "[a] board does not owe fiduciary duties to preferred stockholders when considering whether or not to take corporate action that might trigger or circumvent the preferred stockholders' contractual rights." *In re Trados Inc. Shareholder Litigation*, 73 A.3d at 39; see also *Wolfensohn v. Madison Fund, Inc.*, 253 A.2d 72, 75 (Del. 1969) (holding that former preferred stockholders who received debentures and a share of common stock were not owed fiduciary duties in their capacity as debenture holders and had only their contractual rights as creditors); *LC Capital Master Fund, Ltd. v. James*, 990 A.2d 435, 437 (Del. Ch. 2010) ("[O]nce the QuadraMed Board honored the special contractual rights of the preferred, it was entitled to favor the interests of the common stockholders."); *Fletcher International, Ltd. v. ION Geophysical Corp.*, No. 5109-VCP, 2010 WL 2173838, at *7 (Del. Ch. May 28, 2010) ("[R]ights arising from documents governing a preferred class of stock, such as the [c]ertificates, that are enjoyed solely by the preferred class, do not give rise to fiduciary duties because such rights are purely contractual in nature."); *MCG Capital Corp. v. Maginn*, No. 4521-CC, 2010 WL 1782271, at *15 (Del. Ch. May 5, 2010) ("[D]irectors do not owe preferred shareholders any fiduciary duties with respect to [their contractual] rights."). "Preferred stockholders are owed fiduciary duties only when they do not invoke their special contractual rights and rely on a right shared equally with the common stock." *In re Trados Inc. Shareholder Litigation*, 73 A.3d at 39-40.

¶ 81    Additionally, a corporation owes no fiduciary duty to its shareholder. *In re Wayport, Inc. Litigation*, 76 A.3d at 322-23 (corporation owes no fiduciary duties to its shareholders; only officers or directors do). Moreover, Delaware law does not impose "an affirmative fiduciary duty of disclosure for individual transactions." *Dohmen*, 234 A.3d at 1171; see also our discussion, *infra* ¶ 91.

¶ 82    To support its position that an antireliance provision cannot bar claims by a beneficiary against a fiduciary, plaintiff cites *McDonald's Corp. v. Easterbrook*, No. 2020-0658-JRS, 2021 WL 351967, at *6 (Del. Ch. Feb. 2, 2021). In *McDonald's*, however, the defendant, a former CEO of McDonald's Corporation (McDonald's), who argued that a provision in his severance agreement constituted an antireliance provision barring the company's later fraud claims against him, was a clear fiduciary to the company, much like Rajaram was a clear fiduciary to Mu Sigma. *Id.* However, neither Mu Sigma nor Rajaram owed fiduciary duties to plaintiff individually pursuant to plaintiff's stockholder status in the negotiated

repurchase transaction. See *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010) (the nature and scope of director's duties when causing company to exercise right to redeem shares were defined solely by reference to contract, and any separate fiduciary duty claims arising out of company's exercise of its contract right were foreclosed).

¶ 83    Moreover, plaintiff and Mu Sigma engaged in an arm's-length negotiation over the terms by which Mu Sigma might repurchase its shares. Plaintiff's interest in obtaining a higher redemption price was in opposition to the interests of Mu Sigma and its shareholders generally. That circumstance is not one that, by itself, would give rise to a fiduciary relationship. *Blaustein v. Lord Baltimore Capital Corp.*, No. 6685-VCN, 2013 WL 1810956, at *17 (Del. Ch. Apr. 30, 2013) (concept of fiduciary relationship is more aptly applied in legal relationships where the interest of the fiduciary and the beneficiary incline toward a common goal in which fiduciary is required to pursue solely interests of the beneficiary in the property).

¶ 84    Nevertheless, where a corporation makes a request for shareholder action, the fiduciary duties of directors involve a general duty to disclose to stockholders all material information reasonably available. See *Malone*, 722 A.2d at 9. Accordingly, plaintiff argues that defendants owed it a fiduciary duty of disclosure in connection with Mu Sigma's "request for shareholder action," *i.e.*, the request to repurchase plaintiff's stock, and that it has sufficiently pleaded that defendants breached this duty for failing to disclose material information. Plaintiff asserts that, because Delaware law holds that a claim for a breach of this specific duty does not include the element of reliance (*id.* at 12), then its claim based on this theory may proceed regardless of whether the language in the SRA amounts to an enforceable antireliance provision.

¶ 85    In the absence of a request for shareholder action, Delaware law does not require directors to provide shareholders with information concerning the corporation's finances or affairs. *Id.* at 11; see also *Raskin v. Birmingham Steel Corp.*, No. 11365, 1990 WL 193326, at *5 (Del. Ch. Dec. 4, 1990) (fiduciaries have "no distinctive state law duty to disclose material developments with respect to the company's business" in the absence of a request for stockholder action). However, Delaware law maintains that directors are under a fiduciary duty to fully and fairly disclose all reasonably available, material information when seeking shareholder

action. See *Malone*, 722 A.2d at 9 (citing *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 137-38 (Del. 1997)); *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992); see also *Metro Communication Corp. BVI v. Advanced MobileComm Technologies Inc.*, 854 A.2d 121, 156 (Del. Ch. 2004) (only misrepresentations associated with requests for discretionary action trigger the fiduciary duty of disclosure).

¶ 86    "When the fiduciaries communicate with the beneficiaries in the context of asking the beneficiary to make a discretionary decision ***[,] the fiduciary has the duty to disclose all material facts bearing on the decision at issue." *Metro Communication Corp. BVI*, 854 A.2d at 156. "Whether or not a failure to fulfill that duty will result in personal liability for damages against directors depends upon the nature of the stockholder action that was the object of the solicitation of stockholder votes and the misstated or omitted disclosures in connections with that solicitation." *Loudon*, 700 A.2d at 137-38.

¶ 87    When a director breaches the duty of disclosure arising from the request for shareholder action, his liability is considered "*per se*." *Dohmen*, 234 A.3d at 1168. This means that, when a director requests stockholder action but fails to disclose material facts bearing on that request, the beneficiary stockholder need not demonstrate the elements of reliance, causation, or actual quantifiable monetary damages to succeed on a claim for breach of fiduciary duty. *Id.*; *Malone*, 722 A.3d at 12. Accordingly, the essential inquiry with regard to alleging a breach of the duty of disclosure upon a request for shareholder action is whether the alleged omission or misrepresentation is material, which is determined in light of the shareholder action being sought. *Dohmen*, 234 A.3d at 1167; *Alessi v. Beracha*, 849 A.2d 939, 944 (Del. Ch. 2004). This *per se* rule, however, applies only to nominal damages, not compensatory damages. *Dohmen*, 234 A.3d at 1175. To recover compensatory damages for a breach of the fiduciary duty of disclosure, a stockholder must prove reliance, causation, and damages. *Id.*

¶ 88    The Delaware Court of Chancery's decision in *Latesco, L.P. v. Wayport, Inc.*, No. 4167-VCL, 2009 WL 2246793 (Del. Ch. July 24, 2009), addressed stockholder action and the fiduciary duty of disclosure in the context of an individual stockholder transaction. In *Wayport*, corporate insiders sought to invoke their contractual rights of first refusal in the sale of a minority holder's units without disclosing material facts relating to a pending transaction. *Id.* at *5. The court

declined to characterize the transaction as a request for stockholder action, explaining as follows:

> "The rule requiring calls for stockholder action to be accompanied by full and fair disclosure of all material information regarding the decision presented to the stockholders is premised on the collective action problem that stockholders, in the aggregate, are faced with when asked to vote or tender their shares. In such a situation, it would be impractical, if not impossible, for each stockholder to ask and have answered by the corporation its own set of questions regarding the decision presented for consideration. In the absence of a fiduciary duty by the corporation and its directors to engage in full and fair disclosure, stockholders would thus be forced to make a decision in an information vacuum. These same factors do not, however, come into play when the corporation asks a stockholder as an individual to enter into a purchase or sale. There, the stockholder may refuse to do so until he is satisfied the corporation has given him sufficient information to evaluate the decision presented to him." *Id.* at \*6 (cited with approval by *Dohmen*, 234 A.3d at 1171).

¶ 89    The Delaware court explained in *Wayport* that the duty of disclosure instead arises when a board asks the stockholders as a whole to make a discretionary decision, such as whether to grant a proxy, to vote on a particular matter, to seek appraisal, or to accept merger consideration. *Id.* at \*6 n.18 (citing with approval *Sims v. Tezak*, 296 Ill. App. 3d 503 (1998) (surveying Delaware cases regarding the duty of disclosure and concluding that a corporation's offer to buy an individual shareholder's shares did not implicate the duty of disclosure because it did not constitute a call for shareholder action as contemplated by Delaware case law)). In *Dohmen*, the Supreme Court of Delaware "agree[d] with the Court of Chancery's analysis in *Wayport* and its decision not to impose an affirmative fiduciary duty of disclosure for individual transactions." 234 A.3d at 1171.

¶ 90    Here, "[u]nlike the collective action problem when a large number of stockholders are considering a transaction and depend on directors to disclose material facts bearing on the decision" (*id.*), plaintiff's second amended complaint and the SRA reveal that plaintiff had direct access to Rajaram to negotiate the arm's-length transaction at issue. The SRA involved an individually negotiated

transaction between the corporation and a single, highly sophisticated stockholder, which followed two months of negotiations between the parties and their counsel.

¶ 91    Indeed, the parties expressly agreed in section 6(d) of the SRA that the SRA was "the product of negotiations between the parties hereto represented by counsel." Although Delaware law imposes upon corporate directors a fiduciary duty of disclosure to fully and fairly disclose material information within the directors' control when it seeks shareholder action, Delaware law does not impose a fiduciary duty of candor whenever a company repurchases its own shares. See *Sims*, 296 Ill. App. 3d at 507-08 (although "Delaware courts have imposed upon corporate directors a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action," Delaware law does not clearly impose a fiduciary duty of candor whenever a corporation repurchases its own shares). Accordingly, the appellate court erred in holding that plaintiff's claims might be viable in the context of a company's request for stockholder action.

¶ 92                      C. SRA's Release of Breach of Contract and
                              Unjust Enrichment Claims

¶ 93    Defendants assert that the appellate court erred in declining to enforce plaintiff's general release of all claims against them in the SRA. Defendants assert that the circuit court correctly ruled that plaintiff's release, in addition to supporting the dismissal of plaintiff's fraud and fiduciary duty claims, unambiguously bars the breach of contract and unjust enrichment claims that plaintiff asserted in its second amended complaint.

¶ 94    Plaintiff asserts as a preliminary issue that defendants have not preserved a challenge to the appellate court's conclusion that the circuit court wrongly dismissed both claims based on the SRA's general release provision, for failing to include the argument in their petition for leave to appeal to this court. However, this court may exercise its discretion to decide unpreserved issues that are inextricably intertwined with preserved issues. See *Hansen v. Baxter Healthcare Corp.*, 198 Ill. 2d 420, 429-30 (2002). Moreover, waiver and forfeiture are limitations on the parties and not on the court, and a court may overlook forfeiture

- 31 -

where necessary to reach a just result or maintain a sound body of precedent. See *People v. Sophanavong*, 2020 IL 124337, ¶ 21.

¶ 95 Plaintiff asserts that the appellate court correctly ruled that its breach of contract and unjust enrichment claims should be reinstated. However, we find that plaintiff's unjust enrichment and breach of contract claims fail as a matter of both Delaware and Illinois law.

¶ 96 A release agreement involves the abandonment of a claim and is governed by contract law. *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447 (1991); see also *Seven Investments, LLC v. AD Capital, LLC*, 32 A.3d 391, 396 (Del. Ch. 2011). "The intention of the parties to contract must be determined from the instrument itself, and construction of the instrument where no ambiguity exists is a matter of law." *Farm Credit Bank of St. Louis*, 144 Ill. 2d at 447; see also *Seven Investments, LLC*, 32 A.3d at 396 (if a claim falls within the plain language of a release, then the claim should be dismissed).

¶ 97 Section 5 of the SRA provided that plaintiff "forever generally and completely" released and discharged the defendants:

> "from any and all claims, liabilities, obligations[,] and demands of every kind and nature in law, equity[,] or otherwise, known and unknown, suspected and unsuspected, disclosed and undisclosed, and in particular of and from all claims and demands of every kind and nature, known and unknown, suspected and unsuspected, disclosed and undisclosed, that arose out of or are in any way related to events, acts, conduct[,] or omissions occurring prior to the date of this Agreement; provided, however, that the foregoing release shall not apply to claims relating to Stockholder's right to payment by the Company."

¶ 98 We agree with the circuit court's conclusion that "the broad and comprehensive release agreed to by [plaintiff], a sophisticated party represented by experienced counsel, unambiguously encompasses" plaintiff's unjust enrichment and breach of contract claims found in its second amended complaint. In its breach of contract claim, plaintiff alleged that defendants failed to provide two investor reports prior to executing the SRA, and in its unjust enrichment claim, plaintiff alleged that

improper statements and commissions made in connection with negotiating the repurchase transaction culminated in the SRA itself.

¶ 99    Plaintiff argues that the release is unenforceable because Rajaram was its fiduciary and failed to fully disclose his wrongdoing. However, as discussed *supra*, we have determined that Rajaram was not acting in a fiduciary capacity for plaintiff in the repurchase transaction. Accordingly, plaintiff's claims fail as a matter of law.

¶ 100   Because we have determined, as a matter of law, that plaintiff's fraud in the inducement claims are barred, the SRA stands. *Cf. PHL Variable insurance Co. v. Price Dawe 2006 Insurance Trust*, 28 A.3d 1059, 1067 (Del. 2011) (where there is fraud in the inducement to enter into a contract, the contract is "voidable" at the election of the innocent party). The language of the SRA bars plaintiff's second amended complaint, and we hereby reverse the appellate court's judgment finding otherwise.

## III. CONCLUSION

¶ 102   For the foregoing reasons, we find that the plaintiff's claims, found in its second amended complaint, are barred by the language of the SRA, and the circuit court properly entered judgment in favor of defendants. Accordingly, we reverse the judgment of the appellate court and affirm the circuit court's judgment.

¶ 103   Appellate court judgment reversed.

¶ 104   Circuit court judgment affirmed.