2023 IL App (2d) 220019
No. 2-22-0019
Opinion filed April 24, 2023

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE HIGHVIEW GROUP, LTD., and THOMAS SWARTHOUT, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 17-L-371 |
| WILLIAM RYAN HOMES, INC., and NORTH SHORE BUILDERS, I, INC., | ) ) ) | Honorable Luis A. Berrones, |
| Defendants-Appellants. | ) | Judge, Presiding. |

PRESIDING JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Hutchinson and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendants, William Ryan Homes, Inc. (William Ryan Homes), and its entity, North Shore Builders, I, Inc. (North Shore Builders), appeal an order of the circuit court of Lake County dismissing their petition to vacate a judgment pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2020)). Defendants' petition alleged that plaintiffs, Thomas Swarthout, and his entity, The Highview Group, Ltd. (Highview Group), obtained a judgment by fraud. Defendants argue that the trial court erred by dismissing their petition to vacate because (1) they sufficiently alleged facts showing all the necessary requirements for relief under section 2-1401 of the Code and (2) they demonstrated that the judgment was procured by fraud. For the reasons set forth below, we reverse and remand for further proceedings.

¶ 2                                I. BACKGROUND

¶ 3     In May 2017, Swarthout and his company, Highview Group, filed a complaint against defendants alleging, *inter alia*, breach of implied contract and unjust enrichment. The action involved the development of a 47-acre farm, referred to as the Reilly family property (Reilly property), in Lake Forest. The claims were tried before a jury, which returned a verdict of $510,000 in favor of plaintiffs on the unjust enrichment claim. Defendants moved for judgment notwithstanding the verdict (judgment *n.o.v.*) or for a new trial, both of which were denied. Defendants appealed the denial of their motion for judgment *n.o.v.*, and we affirmed. *Highview Group, Ltd. v. William Ryan Homes, Inc.*, 2019 IL App (2d) 180913-U. Subsequently, defendants brought a petition to vacate the judgment pursuant to section 2-1401 of the Code (735 ILCS 5/2-1401 (West 2020)). Upon plaintiffs' motion, without an evidentiary hearing, the trial court dismissed defendants' petition with prejudice.

¶ 4                            A. The Underlying Litigation

¶ 5     During pretrial discovery Swarthout answered an interrogatory requesting a list of costs or expenses plaintiffs incurred relating to the development of the Reilly property. Swarthout's answer contained a list of "Expenses to Date" indicating that Swarthout paid a total of $676,735.69 and owed $1,372,629. Swarthout's list stated that he paid engineer Michael Bleck, of Bleck's Engineering, $8430 and owed him $175,000 for mapping and engineering services. Swarthout's answer was verified pursuant to section 1-109 of the Code (*id.* § 1-109).

¶ 6     Prior to trial, Bleck filed a separate complaint against defendants, seeking damages in the amount of $249,889 related to the same project. In this case, defendants filed a motion *in limine* to bar, *inter alia*, evidence or argument relating to services provided by Bleck. Defendants argued that evidence of Bleck's fees should be barred to prevent double recovery. In response, plaintiffs asserted that they were entitled to recovery for liabilities incurred and that "the testimony of the

plaintiffs is that those bills have been incurred, and plaintiffs intend on paying those bills out of any award in this matter." The court reserved judgment on defendants' motion *in limine*.

¶ 7     The jury heard testimony in August 2018. Swarthout testified as follows. Swarthout learned that the Reillys were interested in selling the Reilly property, and he spent several years pursuing his "vision" for a residential development. Swarthout called his concept the "White Stable Vineyard," which would consist of 34 single family homes encircling a vineyard. The City of Lake Forest (the city) zoned the property R-4, which required a minimum lot size of 60,000 square feet for single family residences. Swarthout applied for a variance pursuant to an ordinance allowing for a preservation district with smaller lot sizes and a tradeoff for open space. Swarthout planned a road that would roughly encircle the property. The road would go around a large open space with eight acres of vineyard, and homes would be built on the other side of the road. The roads would not be asphalt but would be brick pavers. Residents would use the cottage that was "continuous to the winery for guests that may come in for the weekend."

¶ 8     Swarthout's plan had three access points, and the city approved this plan. The plan also had a pedestrian trail system that would "work its way into the adjacent property," which was owned by the city. Swarthout also planned to plant orchard trees along the berm along Route 60.

¶ 9     Swarthout hired Bleck and a land planner, Nicholas Patera from Teska Associates, to implement his concepts at considerable expense. In December 2009, the city granted tentative preliminary subdivision approval. Swarthout testified that such tentative approval signals to the developer that he has a viable project and is likely to be granted final approval. Plaintiffs obtained final approval of the plat of subdivision on June 21, 2010.

¶ 10     Swarthout testified that he had a contract with the Reilly family to purchase the Reilly property for $17 million. However, the residential real estate market was "bleak," and Swarthout had trouble finding investors or lenders. Swarthout's purchase contract with the Reilly family

expired in October 2013. Swarthout obtained from the city extensions for the zoning approvals, but the final zoning approval extension was set to expire on June 27, 2014. As long as the Reilly family owned the property, Swarthout could not record the plat and begin construction.

¶ 11    However, plaintiffs continued the process of obtaining all the necessary governmental approvals, such as a permit from the United States Army Corps of Engineers for work related to the pond. As part of the final engineering, plaintiffs were required to prepare a stormwater management report and obtain a permit from the Lake County Stormwater Management Agency. Plaintiffs were also required to obtain a permit from the Illinois Environmental Protection Agency (IEPA) for the water connection, obtain a permit for the sanitary sewer, and prepare an archeological survey.

¶ 12    Swarthout testified that, in May 2014, he identified Jacobs Homes as a potential developer and investor. Plaintiffs and Jacobs Homes agreed to pursue the project together, and the Reilly family agreed to sell the property for $10 million. However, in early June 2014, Jacobs Homes withdrew from the project.

¶ 13    James Hanson and Jeffrey Wescott, intermediaries for plaintiffs, identified William Ryan Homes as a potential partner. On June 9, 2014, Wescott scheduled a meeting with William Ryan, the chief executive officer of William Ryan Homes and North Shore Builders. Swarthout sent Ryan all the information he had accumulated for the project. Swarthout included copies of the final plats, final landscape drawings, engineering drawings, marketing information, appraisals, and approvals from the city.

¶ 14    On June 12, 2014, Ryan sent plaintiffs an e-mail setting forth six "purchase scenarios," each of which specified an amount that Swarthout would receive for his work toward the project's completion. The least lucrative scenario, which Ryan labeled the "worst case scenario," specified that Swarthout would receive $1.08 million, which was comprised of (1) a $250,000 fee when

defendants purchased the property from the Reilly family; (2) a $250,000 developer fee; (3) a $10,000 project consulting fee for each of 33 lots as they were sold, amounting to $330,000; and (4) the option of purchasing one of the homes at a $250,000 discount.

¶ 15    The day after sending the e-mail, on June 13, 2014, Ryan met with Swarthout and toured the property. Swarthout testified that, after a conference call with Ryan and others, on June 20, 2014, he believed he had "a deal" with Ryan under which he "would be paid [a] million dollars for past expenses, a million dollars for [his] fee, and [he] would be part of the project." Swarthout testified that he had over $1 million in expenses.

¶ 16    Bleck testified that Swarthout retained him to work on the White Stable Vineyard project. Bleck surveyed the Reilly property, which included surveying the land, the location of the utilities, the trees, the wetlands, and "all of the things that are needed to go into the design." Bleck also prepared a boundary survey. When that information was collected, it went "into a base map." Bleck then began the civil engineering for the project, which entailed designing the roads, the drainage, and the sanitary sewer system and routing the utilities throughout the development. The pond that was on the property was considered a flood plain. Bleck did a drainage study and a "study to get the base foundation for that flood plain established" because it needed to be approved by Lake Forest stormwater management. Bleck produced a topographical map, engineering plans, and a tentative plat of the subdivision for submission to the city. Bleck assisted in applying for permits from the Illinois Department of Natural Resources regarding the roads and from the United States Army Corps of Engineers regarding the wetland areas around the pond. He also submitted an application to the soil conservation district, assisted in getting the property annexed by the Northshore Sanitary District, applied for a permit from the IEPA for water, applied for a sanity sewer permit, and applied for approval from the Illinois Historic Preservation Agency.

¶ 17    According to Bleck, the tentative plats for White Stable Vineyard and defendants' planned development, Westleigh Farm, shared several precise measurements. The identical measurements suggested to Bleck that defendants used plaintiffs' survey and other planning materials, because a survey resulting in the same measurements would be very unlikely.

¶ 18    During cross-examination, while comparing defendants' and plaintiffs' plats, Bleck testified that "[t]he plats do not look copied." Bleck testified that there were differences in the parties' tentative plats, including the amount of open space, the shape of roads, the width of the main road, and the size and shape of the water retention areas. Defendants' plat had fewer wetland areas than plaintiffs' plat, and plaintiffs' plat showed a road that was not included in defendants' plat. Defendants' plat had a clubhouse and a pier, whereas plaintiffs' plat did not have these structures. Bleck also testified that the zoning dictated the maximum number of lots, which in this case was 34, regardless of who developed the property. The permits plaintiffs had obtained ultimately expired, and defendants had to reapply for each permit. Bleck testified that defendants "had to go through the process."

¶ 19    Wescott, a financier working with plaintiffs in 2014 on the White Stable Vineyard project, testified that he was to be "paid out of the project."

¶ 20    Hanson, a developer and advisor for plaintiffs, testified as follows. In 2012 or 2013, Swarthout asked Hanson to assist him in getting investors for the White Stable Vineyard project. Hanson had a verbal agreement with Swarthout that if the White Stable Vineyard "project went forward [he] would pay me $200,000." At the end of June 2014, the entitlements—the approvals necessary to proceed—were about to expire, unless the final plat of the subdivision was signed by the owners of the Reilly property and recorded. Wescott, Hanson's business acquaintance, had a relationship with Ryan.

¶ 21    Ryan testified that, in early June 2014, Wescott, who was a social acquaintance, called and said that he was involved with a property in Lake Forest and was looking for a builder to buy lots. Wescott said that they had most of the financing but their builder had suddenly dropped out and they needed $3 million out of $10 million total. Wescott said that they were in a hurry. Ryan expressed interest. Plaintiffs sent over numerous documents, including zoning approvals, a plat of survey, permits, a market study, financials, engineering drawings, bids for infrastructure, and a timeline for stormwater review. Ryan never requested these documents. Together, Swarthout and Ryan drove around the Reilly property, and Swarthout explained his "vision of the winery and the wine club," including turning the stable into a wine club. Swarthout also told Ryan that he would move the caretakers' house and "make it into a B&B where somebody who was a member of the club had family from out of town, they could bring them in and put them up for the weekend and enjoy the wine club." Ryan's development, Westleigh Farm, is not a vineyard, did not take advantage of the stable, and did not use the caretakers' home; the stable was moved and used for maintenance, and the caretakers' home was demolished.

¶ 22    On June 12, 2014, Ryan sent an e-mail to Swarthout, stating, "In a nutshell we see the worst[-]case scenario, us paying the seller $10 million for the property at one close, entitlements in place, and [Swarthout] receiving $1 million throughout the deal." In addition, Ryan offered Swarthout up to $250,000 as reimbursement for his expenses, $250,000 to be the development manager, and, as project consultant—obtaining permits and plans from the city—$10,000 for each house sold. Swarthout rejected Ryan's offer. In an e-mail Wescott sent to Ryan, he "quickly went from I was going to need $3 million to I was going to need $7 million." Then "it went from the entitlements were expiring to the entitlements were no good," as Swarthout's deal with the sellers unraveled and they wanted to keep him off the property. At the end of June 2014, North Shore Builders entered into an agreement with the owners of the Reilly property for $10 million. The

owners of the Reilly property insisted on a confidentiality provision so that the deal could not be discussed with Swarthout. But North Shore Builders and the owners of the Reilly property did not close based on the June 2014 agreement and the property went back on the market, at which time anyone could have bought it.

¶ 23     Ryan testified that North Shore Builders and the owners of the Reilly property entered into a second agreement for the sale of the property for $9 million. North Shore Builders received final plat approval from the city for Westleigh Farms development in April 2016. Ryan testified that his company did not use plaintiffs' entitlements. "We had to start from ground zero and get them ourselves." Plaintiffs' entitlements expired at the end of June 2014. While Swarthout's vision for White Stable Vineyard included a vineyard, a wine club, and a bed and breakfast (B&B), Ryan and his company developed Westleigh Farms. Plaintiffs and defendants used different designs, building and design architects, land planners, and engineers. The only overlap was the landscape architect, Teska, who did separate landscape plans for plaintiffs and defendants. Teska had been involved with the Reilly property for over 20 years.

¶ 24     Nathan Wynsma, vice president of land for defendants, testified as follows. The plans for plaintiffs' White Stable Vineyard and defendants' Westleigh Farm were similar; both had 34 lots, access to the developments was from the same road (Jacqulyn Lane), and both had similar perimeter roads, similar roadway constructions, and similar stormwater areas. However, the plans had the same number of lots because of the math involved. The Reilly property is 47 acres that reduced to 34 lots due to the topography and the fact that most of the lots are zoned for 60,000 square feet. The perimeter road was required by the city to create a buffer from Ridge Road, Route 60, and the neighborhoods to the west and to preserve the mature woodlands. Defendants did not get the idea to build the perimeter road from plaintiffs. Defendants did not get the idea to have

Jacqulyn Lane be the access road from plaintiffs. The city decided it wanted one access road to the development, and Jacqulyn Lane was the only existing logical and safe road for access.

¶ 25    Wynsma testified that there were differences between plaintiffs' plat and defendants' plat. The geometry of the roads and the road configuration around the outer perimeter were different. The entrances along Ridge Road were different. The sizes of the lots were different. The central open space was different. Defendants had three ponds instead of two. Defendants were building a clubhouse. Defendants designed a berm along Route 60 to be six feet taller, resulting in a larger open space. Defendants added a retaining wall. Plaintiffs had three different access roads to Ridge Road, which the city deemed too close to Route 60 for safety. Plaintiffs used most of the open space for vineyards. Defendants' open spaces were not vineyards and were located in different areas than plaintiffs'.

¶ 26    Wynsma testified that defendants did not record plaintiffs' plat. When defendants bought the Reilly property they had to start over from scratch. Plaintiffs' $10 million letter of intent to Jacobs Homes was of no value to defendants. Tracy Cross's 2012 market study was of no value to defendants. During a meeting on June 17, 2014, Swarthout said that he was not the right person to approach the owners of the Reilly property, because there was "an adversarial relationship" between them.

¶ 27    During closing argument, plaintiffs' counsel remarked on the damages for unjust enrichment. Counsel argued that the materials retained by defendants were "obviously valuable" and supported a verdict of "up to a million dollars."

¶ 28    Regarding plaintiffs' claim for unjust enrichment, the trial court instructed the jury that plaintiffs had to prove that (1) plaintiffs conferred a benefit upon defendants, (2) defendants received the benefit to plaintiffs' detriment, and (3) defendants' retention of the benefit violated fundamental principles of justice, equity, and good conscience. Regarding the calculation of

damages, the court instructed the jury, "In calculating [the amount of damages], you should determine the sum of money that reflects the Defendant[s'] gain, not the [plaintiffs'] loss. Thus, you should not take into consideration the amount of [plaintiffs'] expenses in determining damages. *** You should not award [plaintiffs] any damages for unjust enrichment based on any services rendered by Bleck Engineering."

¶ 29    The jury entered a verdict of $510,000 in plaintiffs' favor on the unjust enrichment count. The trial court entered judgment on August 10, 2018. The court denied defendants' motion for judgment *n.o.v.*, and we affirmed. *Highview Group, Ltd.*, 2019 IL App (2d) 180913-U, ¶ 12 (noting that "Swarthout hired an engineer, Michael Bleck, and a land planner, Nicholas Patera from Teska Associates, to implement his concepts, at considerable expense."). We reasoned that "Swarthout explicitly testified to plaintiffs' expenses to create the plans and other documents that formed the basis for the entitlements" that defendants "accepted and retained." *Id.* ¶¶ 43-44.

¶ 30    After we affirmed the judgment, defendants paid plaintiffs the judgment award plus postjudgment interest.

¶ 31                      B. Defendants' Section 2-1401 Petition

¶ 32    In May 2021, defendants filed a petition to vacate the judgment pursuant to section 2-1401 of the Code (735 ILCS 5/2-1401 (West 2020)). In this petition, defendants alleged that they had discovered evidence indicating that Swarthout did not owe Bleck any money in connection with his work on White Stable Vineyard. In discovery, Swarthout stated in sworn interrogatory answers that he incurred over $1 million in expenses and that he owed Bleck Engineering $175,000. Swarthout testified at trial that he incurred over $1 million in expenses. Throughout the trial and the appeal, Swarthout contended that he owed Bleck payment for engineering services pursuant to a disclosed written agreement. However, in the separate lawsuit filed by Bleck against defendants before this case went to trial, both Bleck and Swarthout revealed during depositions that Swarthout

owed Bleck nothing. In July 2020, Swarthout testified that he did not owe Bleck any money because they had a verbal side agreement, apart from a written agreement, that Bleck would be paid $250,000 when Swarthout's project was funded. Swarthout testified that, because the project was not funded, he did not owe Bleck anything.[1] Bleck corroborated Swarthout's deposition testimony during his July 2020 deposition. In December 2021, during the Bleck trial, Swarthout testified that, during the trial in this case, he testified that he had $1 million in expenses and that the $250,000 he "owed" Bleck was included in the $1 million. After Swarthout received his judgment award, he did not pay Bleck.

¶ 33 Defendants alleged that, based on the fraudulent concealment of the secret side agreement, plaintiffs obtained a judgment of $510,000 on their unjust enrichment claim. Swarthout falsely claimed in a written interrogatory that he owed Bleck $175,000 for engineering services. Further, at trial, Swarthout testified that his financial obligations to Bleck and others totaled $1 million. Defendants claimed they had a meritorious defense because Swarthout's fraudulent concealment of the secret side agreement deprived defendants of information that they could have used to challenge plaintiffs' damages claimed in the unjust enrichment claim; defendants suffered a detriment; and plaintiffs' retention of the benefit violated fundamental principles of justice, equity, and good conscience. Defendants alleged that, absent Swarthout's fraudulent concealment and fraud on the court, defendants would have established that Swarthout owed nothing to Bleck Engineering for its engineering plans that Swarthout shared with defendants. At trial, credibility was critical to plaintiffs' unjust enrichment claim. Swarthout introduced no invoices, no receipts, and no proof of payment for any of his alleged expenses on the White Stable Vineyard project.

---

[1]During oral argument, plaintiffs' counsel stated that he first learned of the side agreement between Swarthout and Bleck in July 2020, during Swarthout's deposition.

Evidence of plaintiffs' right to recover and their damages consisted solely of Swarthout's testimony in which he falsely inflated his expenses.

¶ 34    Defendants also alleged that their petition was timely filed within the two-year statute of limitations because they did not discover the secret agreement until July 2020. Further, defendants alleged that they were diligent in pursuing the petition, because they filed it 11 months after discovering Swarthout's fraudulent concealment and one month after the conclusion of the Bleck lawsuit.

¶ 35    Defendants sought the following relief: (1) an evidentiary hearing on their petition; (2) vacatur of the August 2018 judgment entered in plaintiffs' favor; (3) an order directing plaintiffs to pay defendants $569,104.11, plus interest (the amount defendants paid plaintiffs in satisfaction of the judgment); (4) dismissal with prejudice of plaintiffs' complaint; and (5) sanctions against plaintiffs in the amount of reasonable attorney fees and costs incurred in defending plaintiffs' claims, litigating the appeal, and pursuing their petition to vacate.

¶ 36    In August 2021, plaintiffs filed a combined motion to dismiss defendants' petition pursuant to section 2-619.1 of the Code (*id.* § 2-619.1), arguing that defendants lacked a meritorious defense and failed to file within two years and that therefore their petition should be dismissed pursuant to section 2-619 of the Code (*id.* § 2-619). Plaintiffs also argued that defendants' petition should be dismissed pursuant to section 2-615 of the Code, based upon a lack of due diligence.

¶ 37    In response, defendants asserted that Swarthout's fraud was a meritorious defense, defendants' petition was timely filed because it was filed within two years of learning of Swarthout's fraud, and defendants were diligent in filing their petition.

¶ 38    On December 14, 2021, following a hearing, the trial court granted plaintiffs' combined motion to dismiss defendants' petition with prejudice, finding that, although defendants established that the petition was timely filed and established due diligence, they failed to establish

a meritorious defense. The trial court's dismissal of defendants' section 2-1401 petition was based on its determination that, even if Swarthout had been impeached at trial with the truth that he did not actually owe Bleck anything, "it wouldn't have made any difference to the rest of the testimony with respect to" the jury's unjust enrichment verdict and award of $510,000 in damages. The trial court, therefore, determined that defendants failed to set forth a meritorious defense.

¶ 39     This timely appeal followed.

¶ 40                                    II. ANALYSIS

¶ 41     The trial court granted plaintiffs' motion to dismiss defendants' petition to vacate, pursuant to section 2-619.1 of the Code (*id.* § 2-619.1). Section 2-619.1 allows a party to combine a section 2-615 motion to dismiss (*id.* § 2-615) with a section 2-619 motion to dismiss (*id.* § 2-619). *Walworth Investments-LG, LLC v. Mu Sigma, Inc.*, 2022 IL 127177, ¶ 39. A motion to dismiss under section 2-615 challenges the legal sufficiency of the petition by alleging defects on its face. *Id.* In reviewing the sufficiency of a petition, we accept as true all well-pleaded facts and all reasonable inferences that may be drawn from those facts, and we construe the allegations in the petition in the light most favorable to the petitioner. *Id.* A court should not dismiss a petition pursuant to section 2-615 unless it is clearly apparent that no set of facts can be proved that would entitle the petitioner to recovery. *Doe v. Coe*, 2019 IL 123521, ¶ 31.

¶ 42     Section 2-619 of the Code permits dismissal where "the claim asserted *** is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2020). A motion to dismiss under section 2-619(a)(9) admits the legal sufficiency of the petition but asserts certain defects or defenses outside the pleadings that defeat the claim. *Dawkins v. Fitness International, LLC*, 2022 IL 127561, ¶ 24. We review *de novo* a dismissal under section 2-615 or 2-619 of the Code. *Walworth Investments-LG, LLC*, 2022 IL 127177, ¶ 40.

¶ 43    Section 2-1401 of the Code provides a comprehensive statutory procedure by which final orders, judgments, and decrees may be vacated after 30 days from the entry thereof. 735 ILCS 5/2-1401(a) (West 2020). To be entitled to relief under section 2-1401, the petitioner must affirmatively set forth factual allegations supporting that (1) a meritorious claim or defense exists, (2) the petitioner exercised due diligence in discovering the defense or claim in the original action, and (3) the petitioner exercised due diligence in filing the section 2-1401 petition. *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 220-21 (1986). A meritorious defense is one that, were it credited by the relevant trier of fact, would defeat the plaintiff's claim in the underlying action. *Lyons Lumber & Building Center, Inc. v. 7722 North Ashland, LLC*, 2016 IL App (3d) 140487, ¶ 22.

¶ 44    Defendants argue that they properly alleged the existence of a meritorious defense because they alleged that (1) Swarthout's misrepresentations called into question his credibility and, (2) had Swarthout told the truth at trial, defendants would have presented evidence that would have defeated plaintiffs' unjust enrichment claim.

¶ 45    Regarding the issue of Swarthout's credibility, we find instructive *Cartwright v. Goodyear Tire & Rubber Co.*, 279 Ill. App. 3d 874 (1996). In *Cartwright*, the plaintiff brought a product liability action against a tire manufacturer to recover for personal injuries sustained as a result of a vehicle accident. *Id.* at 876. The plaintiff testified in detail at trial that he was a Vietnam veteran who had received multiple commendation medals, including the distinguished Purple Heart medal, as a result of his courageous conduct under fire. *Id.* at 877. Further, the plaintiff's counsel, during opening statement and closing argument, referred to the plaintiff's military heroism and recounted the tale of the plaintiff's valor under enemy fire. *Id.* at 880. The jury awarded over $9 million to the plaintiff for his personal injuries and $2 million to the plaintiff's wife for loss of consortium. *Id.* Subsequently, the defendant filed a petition to set aside the judgments pursuant to section 2-1401 of the Code, alleging that it had discovered evidence indicating that a letter presented at trial

purporting to document the plaintiff's military heroism was fake and that all the plaintiff's claims of valor were false. *Id.* The trial court granted the plaintiff's motion to dismiss the section 2-1401 petition, reasoning that the plaintiff's testimony regarding his military service was irrelevant and immaterial and that members of the jury had been instructed that neither sympathy nor prejudice should influence their verdict. *Id.* at 883. On appeal, the reviewing court held that the trial court erred in dismissing the section 2-1401 petition without holding an evidentiary hearing, because "the allegations of false testimony call into question the veracity of [the plaintiff's] assertions relative to both liability and damages." *Id.* at 885.

¶ 46 Here, examination of the record establishes that Swarthout's credibility was an essential element of plaintiffs' claim for unjust enrichment and to the establishment of damages. To prevail on a claim for unjust enrichment, a plaintiff must prove that the defendant "retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 131 Ill. 2d 145, 160 (1989). The measure of damages for unjust enrichment is the reasonable value of the benefit received and retained by the defendant. *Seiden Law Group, P.C. v. Segal*, 2021 IL App (1st) 200877, ¶ 31.

¶ 47 Swarthout's testimony was the only evidence presented at trial to establish the value of the benefit received and retained by defendants. Swarthout testified that he incurred $1 million in expenses on the project and that he gave what he had to defendants. However, Swarthout provided no invoices, receipts, nor proof of payment. Swarthout detailed Bleck's engineering work, including the plat Bleck prepared, which was included in materials defendants retained. Further, during closing argument, counsel for plaintiffs argued that the proper amount of damages was a minimum of $1 million "because that is the value that [plaintiffs] contributed to the property" and that Swarthout had proved that he incurred "the expense of a million dollars." Therefore, contrary

to the conclusion of the trial court, the evidence of Swarthout's testimony regarding Bleck and the value of the materials he gave to defendants cannot be characterized as immaterial and irrelevant where the credibility of Swarthout's testimony was of paramount importance.

¶ 48 Plaintiffs argues that, even if Swarthout provided false testimony, defendants failed to demonstrate that the verdict would have been in their favor. Plaintiffs contend that the jury relied on the testimony of three other witnesses who all testified that plaintiffs provided materials to defendants. However, only Swarthout testified regarding the value of these materials. Only Swarthout testified regarding the expenses he incurred in obtaining the materials and the value of the benefit conferred on defendants. Plaintiffs offered no evidence, *i.e.*, receipts, invoices, checks, apart from Swarthout's testimony, to establish the value of the materials he provided to defendants. Therefore, Swarthout's credibility was paramount to the jury's verdict.

¶ 49 Plaintiffs also note that the jury did not hear the amount of Bleck's engineering bill, and the trial court instructed the jury that, when determining damages, it should not consider the amount of plaintiffs' expenses and it should not award damages based on services rendered by Bleck. However, the trial court's instructions did not preclude the jury from considering plaintiffs' expenses in determining *liability*. Further, the court instructed the jury that plaintiffs claimed that defendants received the benefit of plaintiffs' "expensive materials" created in connection with the project and claimed that it would be unjust if defendants did not pay for them. Swarthout testified that he provided defendants with all of plaintiffs' documents. The record indicates that many, if not most of these documents were prepared by Bleck. The only evidence regarding the value of these documents came from Swarthout, who valued them at a minimum of $1 million. With this in mind, defendants' allegation, that Swarthout lied about the value of the documents retained by defendants, if believed by the jury, would have defeated plaintiffs' unjust enrichment claim. See *Lyons Lumber & Building*, 2016 IL App (3d) 140487, ¶ 22 (a meritorious defense is one that, if

believed by the trier of fact, would defeat the plaintiffs' underlying claim). Based on this record, we determine that defendants sufficiently set forth allegations establishing a meritorious defense.

¶ 50    Plaintiffs also argue that Swarthout did not knowingly provide false testimony. In 2018, at the underlying trial, Swarthout testified that he provided defendants with valuable documents, including many prepared by Bleck, and that Swarthout had incurred $1 million in expenses for those documents. However, in 2020, at Bleck's trial, both Swarthout and Bleck testified that in 2010, they agreed that Swarthout would pay Bleck only when the project was funded. Swarthout also testified that, since the project was never funded, he did not owe Bleck any money. Because Swarthout knew about the side agreement with Bleck long before he testified at the underlying trial, we are perplexed at plaintiffs' assertion—which is disingenuous at best—that Swarthout did not knowingly provide false testimony. In any case, we accept all well-pleaded allegations as true, unless positively rebutted by the record. Here, the record supports, rather than rebuts, defendants' allegations.

¶ 51    Finally, plaintiffs note that we have already affirmed the jury's verdict. See *Highview Group, Ltd.*, 2019 IL App (2d) 180913-U. However, "when a petitioner invokes section 2-1401 to obtain relief from an adverse circuit court judgment, the petitioner is asking the circuit court to revisit the correctness of the court's own judgment." *Price v. Philip Morris, Inc.*, 2015 IL 117687, ¶ 25. This applies even where a reviewing court affirmed the original judgment. *Id.* ¶ 26.

¶ 52    In sum, because the allegations of false testimony call into question the veracity of Swarthout's testimony relative to both liability and damages, we determine the trial court erred by dismissing defendants' section 2-1401 petition. Because Swarthout presented a false interrogatory answer and false testimony, we reverse the dismissal of defendants' section 2-1401 petition to vacate and remand the cause to the trial court with directions to conduct an evidentiary hearing to determine whether the factual allegations regarding Swarthout's false testimony are true. If the

allegations are true, the court shall vacate the judgment and consider any other relief sought by defendants.

¶ 53                                      III. CONCLUSION

¶ 54    The judgment of the circuit court of Lake County dismissing the section 2-1401 petition is reversed, and the case is remanded with directions.

¶ 55    Reversed and remanded with directions.

*Highway Group, Ltd. v. William Ryan Homes, Inc.*, **2023 IL App (2d) 220019**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 17-L-371; the Hon. Luis A. Berrones, Judge, presiding. |
| **Attorneys for Appellant:** | C. Barry Montgomery, Michael Kozlowski, and Bradley Lohsl, of Esbrook P.C., of Chicago, for appellants. |
| **Attorneys for Appellee:** | Joseph T. Morrison, of Kelleher & Holland, LLC, of North Barrington, for appellees. |