2024 IL App (1st) 232291-U

SECOND DIVISION
June 28, 2024

No. 1-23-2291

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| Edip PETKAS; INOA VENTURES MANAGEMENT, LLC, a Delaware limited liability company; MAESTRO INTERNATIONAL CARGO LLC, a Delaware limited liability company; and Philip FORNARO, | ) ) ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiffs-Counterclaim Defendants-Appellees, | ) ) | 2021CH6272 |
| v. | ) ) | Honorable |
| ORANGE PELICAN, LLC, a Wisconsin limited liability company, | ) ) | Pamela McLean Meyerson, Judge Presiding |
| Defendant-Counterclaimant-Appellant. | ) ) | |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Howse and Justice Ellis concurred in the judgment.

**O R D E R**

¶ 1    *Held*: Fraud-based and breach of fiduciary duty claims about the redemption of ownership in a Delaware corporation were properly dismissed due to general release and antireliance language in the parties' redemption agreement.

¶ 2    A week after the circuit court denied a motion to dismiss the claims of Orange Pelican, LLC's (Orange Pelican) that it had been defrauded when selling back its membership interest in Maestro International Cargo, LLC (Maestro), the Illinois supreme court issued an opinion in *Walworth Investments-LG, LLC v. Mu Sigma, Inc.*, 2022 IL 127177, that caused the circuit court

to reconsider and grant the dismissal. In *Walworth*, the supreme court found that a former stockholder's claims of fraud in the repurchase of his interests were barred by antireliance and general release terms in the parties' repurchase agreement. After dismissing Orange Pelican's claims, the court enforced an indemnity clause which shifted attorney fees. In this appeal, Orange Pelican argues that (1) *Walworth* is not on point because it involved a corporation rather than a limited liability company and (2) as a Delaware limited liability company, Maestro's manager owed fiduciary duties of loyalty and care to disclose honest financial information to Maestro's members, regardless of any exculpatory terms that were included in the membership repurchase agreement.

¶ 3    Orange Pelican is a Wisconsin limited liability company that is based in Franklin, Wisconsin and managed by Arvind Ahuja. It owned 25.12% of Maestro. Orange Pelican was entitled to appoint two of the five seats on Maestro's board of directors and appointed Ahuja to one of the positions.

¶ 4    Maestro is based in Chicago but is a Delaware limited liability company and its First Amended and Restated Operating Agreement, effective January 24, 2018, states that it is governed by Delaware law. Maestro is in the business of providing Customs bonded warehouse services near O'Hare International Airport. According to the United States Customs and Border Protection agency, "A Customs bonded warehouse is a building or other secured area in which imported dutiable merchandise may be stored, manipulated, or undergo manufacturing operations without payment of duty for up to 5 years from the date of importation." *U.S. Customs and Border Protection Bonded Warehouse*, Revised Feb. 2010, at 1, *available at* https://www.cbp.gov/sites/default/files/documents/bonded_20wh2_2.pdf.

¶ 5    Maestro's individual owners/members do not manage the company's day-to-day operations. Instead, Inoa Ventures Management, LLC (Inoa), which is an Illinois limited liability company located in Chicago, is Maestro's manager. Inoa's managing members are Edip Pektas and Sanj Rethi. Philp Fornaro is a partner but not a managing member of Inoa. Fornaro is also an attorney. Inoa filled one of Maestro's five director seats. Another seat was filled by an entity that is not implicated in this litigation, Chicago Illinois Burak Cargo Investment LLC. That company, Orange Pelican, and Inoa mutually filled the fifth seat on the board of directors.

¶ 6    Orange Pelican redeemed its ownership interests in Maestro on November 27, 2020 and about a year later, on October 26, 2021, filed a commercial demand for arbitration, alleging that the redemption occurred at a discounted value due to wrongful conduct by Petkas, Inoa, Maestro, and Fornaro. According to Orange Pelican, Maestro's purported worth when it was repurchasing Orange Pelican's interests in 2020 was $3.75 million, but Maestro was sold the following year for $90 million.

¶ 7    Pektas, Inoa, Maestro and Fornaro responded in part to the arbitration demand by filing an action for declaratory and injunctive relief in the circuit court, in which they alleged that the disagreement about the repurchase was not subject to arbitration. In their first amended complaint, they added Count II, seeking a judicial declaration of their contractual right to indemnity.

¶ 8    Orange Pelican answered and counterclaimed. The counterclaim is the pleading at issue on appeal. Although we will be analyzing a counterpleading, for the sake of simplicity, we will refer to Orange Pelican as the plaintiff and to Petkas, Inoa, Maestro, and Fornaro collectively as either the defendants or the Maestro defendants.

¶ 9    Orange Pelican's complaint included claims of breach of fiduciary duty, fraudulent

inducement and fraudulent concealment. Orange Pelican alleged that Inoa's managing members, Pektas and Rethi, along with Fornaro, denied repeated requests for financial information and projections. They had also falsely stated that the information could not be provided or would not be reliable, even though Inoa had recently compiled the financial data to append to a loan application and was secretly negotiating Maestro's sale. Orange Pelican claimed that it redeemed its membership interest in Maestro "at a staggeringly discounted rate" because of the defendants' fraudulent statements and omissions and that its damages exceeded $30 million. Orange Pelican had received $3.75 million for relinquishing its ownership interests in Maestro.

¶ 10    We note that it is undisputed that the redemption agreement was supported by consideration. It includes an integration clause and an Illinois choice-of-law clause. Also, Orange Pelican and Maestro were represented by separate counsel. Orange Pelican was represented by Husch Blackwell LLP and Maestro was represented by Fornaro Law (Fornaro's law firm).

¶ 11    The Maestro defendants moved to dismiss, arguing that section 3.01(d) of Orange Pelican's "Membership Interest Redemption Agreement" (Redemption Agreement), which had been negotiated at arms' length, waived and abandoned any such claims. Section 3.01(d) states in relevant part:

> "Valuation of the Company. The valuation of the Company is Three Million Seven-Hundred Fifty Thousand One Hundred Seventy-Seven and No/100s Dollars ($3,750,177.00) (the 'Agreed Valuation'), which Agreed Valuation is mutually agreed to by the Parties on the basis of the Company's internal valuation, and the Company has made no representations or warranties as to the accuracy or methods resulting in the Agreed Valuation. The Agreed Valuation represents the fair market value of the Company[] and

incorporated by this reference herein (the 'Capitalization Table & Valuation'). Seller [Orange Pelican] represents, warrants, and covenants that: (i) it has had a full and fair opportunity to conduct an independent determination of the fair market value of the Company and/or the Subject Interest; (ii) the Capitalization Table & Valuation accurately sets forth all of Seller's Membership Interest in the Company, and Seller's share value and equity basis in the Company; and (iii) *Seller hereby waives any right or remedy it may have under Law to challenge the Agreed Valuation* or to make any claim for fair market value of the Company and/or Subject Interest in connection with the Transactions contemplated by this Agreement, or the basis for such valuation of the Company and/or Subject Interest pursuant to the Capitalization Table & Valuation." (Emphasis added.)

¶ 12   Orange Pelican responded that terms in the redemption agreement could not bar the fraud claims of a minority owner because minority owners are owed a " '[fiduciary] duty of full disclosure of material facts when making a settlement and obtaining a release.' " *ICD Publications, Inc. v. Gittlitz*, 2014 IL App (1st) 133277, ¶ 65 (quoting *Cwikla v. Sheir*, 345 Ill. App. 3d 23, 33 (2003)). Orange Pelican also contended that section 3.01(d) had been procured by fraud and was not enforceable. Initially, the circuit court denied the motion to dismiss the counterclaim, reasoning that the redemption agreement itself could be voided if it had been induced by misrepresentations or omissions of fact where there was a duty to disclose. Subsequently, however, the defendants successfully sought reconsideration on the basis of *Walworth*, 2022 IL 127177.

¶ 13   After the counterclaim was dismissed, the Maestro defendants filed a motion for summary judgment as to their second count, arguing that Orange Pelican's arbitration action and later lawsuit breached the representation and warranties in Section 3.01(d) and entitled the Maestro defendants

to indemnification under Section 10.01 of the redemption agreement. Section 10.01 provides in relevant part:

> "Indemnity of Buyer. From and after the Closing, Seller [Orange Pelican] shall indemnify and hold harmless the Buyer *** for any and all Losses incurred or suffered by the [Buyer] resulting from, arising out of or related to: (a) any inaccuracy in or breach of a representation or warranty made by Seller in Article III of this Agreement; (b) any each of any covenant or agreement required to be performed by Seller in this Agreement."

¶ 14    In response, Orange Pelican argued that the indemnification clause would have been triggered if Orange Pelican had disputed the parties' agreed-upon valuation, but the clause did not apply to a challenge about the formation of the agreement itself.

¶ 15    The circuit court granted summary judgment to the Maestro defendants and next considered their petition for attorney fees, which was supported by the lead attorney's affidavit and the detailed time sheets of six attorneys who had worked on the arbitration action and litigation in 2021, 2022, and 2023. They sought and were awarded $314,475 as reasonable attorney fees and $766 as reasonable costs and expenses.

¶ 16    In this appeal, Orange Pelican challenges the grant of Maestro and Inoa's motion to dismiss Orange Pelican's counterclaim under section 2-619(a)(9) of the Code of Civil Procedure (Code). 735 ILCS 5/2-619 (a)(9) (West 2022). We address the ruling *de novo*. *Walworth*, 2022 IL 127177, ¶ 40.

¶ 17    Section 2-619 provides for dismissal where the claim at issue " 'is barred by other affirmative matter avoiding the legal effect of or defeating the claim.' " *Id.* (quoting 735 ILCS 2-619(a)(9) (West 2018)). " 'The phrase "affirmative matter" encompasses any defense other than a

negation of the essential allegations of the plaintiff's cause of action.' " *Id.* (quoting *Kedzie & 103rd Currency Exchange, Inc. v Hodge*, 156 Ill. 2d 112, 115 (1993)). The moving party thus admits the legal sufficiency of the complaint, but asserts an affirmative defense or other matter to defeat the plaintiff's claim. *Kedzie & 103rd Currency Exchange*, 156 Ill. 2d at 115.

¶ 18    According to Orange Pelican, the circuit court erroneously relied on *Walworth* for the proposition that the manager of a limited liability company (LLC) does not owe fiduciary duties to an individual LLC member like Orange Pelican whenever the LLC repurchases its own shares. Orange Pelican argues that this precedent is distinguishable because it concerned a corporation rather than an LLC. Instead of *Walworth*, Orange Pelican directs us to the Delaware Limited Liability Company Act (6 DE Code § 18-1104(c) (2023)), for the proposition that Maestro owed fiduciary duties of loyalty and care to individual members, because that statute contains a default rule of traditional fiduciary duties unless they are disclaimed in the LLC's operating agreement. Orange Pelican also cites a handful of general statements of Delaware fiduciary duty law.

¶ 19    In *Walworth*, the Illinois supreme court held that fiduciary duties are governed by the law of the state where the entity was created. *Walworth*, 2022 IL 127177, ¶ 41 (citing *Prime Leasing, Inc. v Kendic*, 332 Ill. App. 3d 300, 314 n. 1 (2002)). In this case, Maestro was organized as a Delaware limited liability company and, therefore, Delaware fiduciary duty law applies to Orange Pelican's fiduciary duty claim against Maestro and Inoa. *Walworth*, 2022 IL 127177, ¶ 41. Furthermore, Maestro's First Amended and Restated Operating Agreement provides that it is governed by Delaware law. Orange Pelican also expressly acknowledges that "the existence of fiduciary duties are governed by Delaware law."

¶ 20    Orange Pelican's attempt to distinguish a corporation from an LLC is not persuasive,

because although Maestro is an LLC, it is structured like a corporation. A corporation is managed by its board of directors, not its owners/shareholders. See *Obeid v. Hogan*, CV 11900-VCL, 2016 WL 3356851, at *6 (Del. Ch. June 10, 2016). In contrast, the owners/members of an LLC have discretion to choose their management structure. *Id*. at *5. "Limited liability companies are creatures of contract, and the parties have broad discretion to use an LLC agreement to define the character of the company and the rights and obligations of its members." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 880 (Del. Ch. 2009). "Virtually any management structure may be implemented through the company's governing instrument." Robert L. Symonds, Jr. & Matthew J. O'Toole, *Delaware Limited Liability Companies* § 9.01[B], at 9-9 (2015). An LLC's organizers may, for instance, opt for the owners to oversee the company's daily business operations (a member-managed management structure) or they may appoint a manager to do the work for them (a manager-managed management structure). See *Obeid*, at *5-6.

¶ 21    Under Delaware law, if an LLC chooses to be governed like a corporation rather than like a partnership, then corporate law is on point:

> "Using the contractual freedom that the [Delaware] LLC Act bestows, the drafters of an LLC agreement can create an LLC with bespoke governance features or design an LLC that mimics the governance features of another familiar type of entity. The choices that the drafters make have consequences. If the drafters have embraced the statutory default rule of a member-managed governance arrangement, which has strong functional and historical ties to the general partnership (albeit with limited liability for the members), then the parties should expect a court to draw on analogies to partnership law. If the drafters have opted for a single managing member with other generally passive, non-managing members, a

structure closely resembling and often used as an alternative to a limited partnership, then the parties should expect a court to draw on analogies to limited partnership law. If the drafters have opted for a manager-managed entity, created a board of directors, and adopted other corporate features, then the parties to the agreement should expect a court to draw on analogies to corporate law." *Id.*

¶ 22    *Kelly v. Blum*, C.A. No. 4516-VCP, 2010 WL 629850, at *11 n.73 (Del. Ch. Feb. 24, 2010) ("Manager-managed LLCs are, in many ways, analogous to corporations, whereas member-managed LLCs may be more analogous to a partnership. Thus, while some [Delaware] cases have looked to the law of limited partnerships when dealing with member-managed LLCs *** it is often more appropriate to analogize to corporations when dealing with manager-managed LLCs.").

¶ 23    Maestro is a Delaware LLC that is manager-managed by Inoa and run by a five-seat board of directors. It is not managed by its individual members. The Mastro defendants also point out that the organization's First Amended and Restated Operating Agreement contained no contractual fiduciary duties, despite the parties' ability to insert fiduciary duties deviating from the common law. Maestro is, therefore, analogous to a Delaware corporation for purposes of evaluating Orange Pelican's breach of fiduciary duty claim under the *Walworth* decision. *Walworth*, 2022 IL 127177.

¶ 24    Orange Pelican's attempt to replace *Walworth* with the Delaware Limited Liability Company Act and then string together general statements about Delaware fiduciary duty law *outside the context of a redemption agreement* is a roundabout way of relitigating the supreme court's decision. Orange Pelican argues that "Delaware courts hold managers of an LLC liable for breach of fiduciary duty and fraud when they violate the duties of loyalty and care." It supports this general statement by citing cases such as *77 Charters, Inc. v. Gould*, C.A. No. 2019-0127-

JRS, 2020 WL 2520272, at *7 (Del. Ch. May 18, 2020), and *In re Cadira Group Holdings, LLC Litigation*, C.A. No. 2018-0616-JRS, 2021 WL 2912479, at *11 (Del. Ch. July 12, 2021). The first case addressed allegations of theft of corporate opportunities and waste, not a membership redemption. The second case primarily addressed competing claims of breach of contractual commitments in a failed joint venture, not a redemption of ownership interests. Orange Pelican's reasoning is unpersuasive.

¶ 25    As detailed below, *Walworth* is factually similar to the dispute at hand and its relevance is undeniable. The supreme court has determined: "Although Delaware law imposes upon corporate directors a fiduciary duty of disclosure to fully and fairly disclose material information within the directors' control when it seeks shareholder action, Delaware law does not impose a fiduciary duty of candor whenever a company repurchases its own shares." *Walworth*, 2022 IL 127177, ¶ 91. *Walworth* bars Orange Pelican's breach of fiduciary duty claims regarding the repurchase agreement.

¶ 26    Walworth was an early investor in Mu Sigma, which is a privately-held data analytics company that was incorporated in Delaware in 2005 and headquartered in Northbrook, Illinois. *Id.*, ¶ 5. Walworth first invested $1.5 million to buy shares totaling 21% ownership in Mu Sigma, and a few years later, it bought even more stock. *Id.*, ¶¶ 5, 7. Mu Sigma was able to attract "an elite clientele, which included companies like Dell, Microsoft, and Walmart," purportedly in part because of Walworth's "reputational capital." *Id.*, ¶ 6. It experienced "explosive growth" (*Id.*, ¶ 9) and was quite profitable. *Id.*, ¶ 6.

¶ 27    In 2010, however, Mu Sigma's founder—who was also Mu Sigma's chief executive officer and the chair of its board of directors—proposed repurchasing Walworth's shares, explaining that

the business had irretrievably changed and its future prospects were dim. *Id.*, ¶¶ 9-10. He said that there was " 'no upside left' " for the company and it "would not 'be his big success.' " *Id.*, ¶ 9. He invited Walworth to become a " 'lead investor in [his] next company' " and said that he intended to make the same repurchase offer to Mu Sigma's other early investors. *Id.*, ¶¶ 9-10.

¶ 28    In the months leading up to the repurchase from Walworth, Mu Sigma's founder allegedly instructed Mu Sigma's CFO to stop sending monthly investor reports to Walworth. *Id.*, ¶ 19. These reports showed that Mu Sigma was thriving and even outperforming its financial projections. *Id*. After the repurchase, Walworth learned that 2010 was actually Mu Sigma's highest growth year between 2008 and 2013. *Id*., ¶ 17. Mu Sigma's growth far exceeded even the founder's prediction of " 'huge growth,' " and by 2015 it "was generating more than $250 million in annual revenue and more than $125 million in annual cash profits." *Id.*, ¶¶ 20-21. Walworth had been bought out of Mu Sigma for about $9.3 million and claimed in its 2016 lawsuit that "had it not relinquished its stake, it would own Mu Sigma shares worth hundreds of millions of dollars." *Id.*, ¶ 21.

¶ 29    Walworth's claims against Mu Sigma and its founder included fraudulent inducement, fraudulent concealment, negligent misrepresentation, and breach of fiduciary duty. *Id*., ¶ 23. However, in the parties' stock repurchase agreement, Walworth agreed that:

> "(1) it had received the information it deemed necessary to decide whether to sell the stock, (2) [Mu Sigma and its founder] had not made any representations outside the [repurchase agreement] (3) it released and discharged [Mu Sigma and its founder] from any known or unknown claims, (4) the [repurchase agreement] contained the complete agreement and understanding between the parties and superseded any prior understandings, and (5) the [repurchase agreement] would be governed by Delaware law." *Id.*, ¶ 11.

¶ 30 The circuit court disposed of Walworth's lawsuit as a matter of law, dismissing the claims on the primary basis that the parties' repurchase agreement, which included antireliance and general release provisions, barred Walworth's causes of action. *Id*., ¶ 2. The appellate court reversed, but the supreme court reversed that decision and affirmed the circuit court's dismissal.

¶ 31 The supreme court reached this result after methodically examining the contract's antireliance and general reliance language, which we will discuss below. The supreme court also scrutinized Delaware fiduciary law and determined that Delaware law does not impose a fiduciary duty of candor when a company repurchases its own shares. *Id*., ¶ 11. The court contrasted Walworth and Mu Sigma's repurchase negotiations with instances when a large number of stockholders are contemplating a sale and must depend on the company's directors to disclose the material facts. *Id*., ¶ 90. The complaint and the repurchase agreement indicated that Walworth had direct access to Mu Sigma's founder when they negotiated the arms-length transaction. *Id*. The sale was an individually negotiated transaction between the company and one, highly sophisticated stockholder. *Id*. In addition, the repurchase agreement was the product of two months of negotiations which included the parties and their attorneys. *Id*. The parties expressly stated in the contract that it was the result of negotiations between the parties who were represented by counsel. *Id*. Under these circumstances, the court concluded:

> "Although Delaware law imposes upon corporate directors a fiduciary duty of disclosure to fully and fairly disclose material information within the directors' control when it seeks shareholder action, Delaware law does not impose a fiduciary duty of candor whenever a company repurchases its own shares. See *Sims*, 296 Ill. App. 3d at 507-08, 694 N.E.2d 1015 (although 'Delaware courts have imposed upon corporate directors a fiduciary

duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action,' Delaware law does not clearly impose a fiduciary duty of candor whenever a corporation repurchases its own shares)." *Id.*, ¶ 91.

¶ 32    Similarly, here, the redemption involved a small number of individuals; the parties were represented by counsel in an arm's length transaction; and the seller had access to the company's records because the seller controlled two of the five seats on the board of directors and held the largest single ownership interest in the company. These are indications that the Maestro defendants did not owe Orange Pelican fiduciary duties when repurchasing Orange Pelican's membership interests. As there was no fiduciary duty of candor, the first of Orange Pelican's three counts, its breach of fiduciary duty count, was properly dismissed. Its second count, fraudulent inducement, was also properly dismissed because it relied on allegations of a fiduciary relationship:

> "41. By virtue of the special and fiduciary relationship between [Orange Pelican], Inoa, and Maestro, [Orange Pelican] reasonably relied on [their] false representations."

> 42. [The] false representations, and [Orange Pelican's] reasonable reliance on them, caused damages in the amount of at least $30,000,000 (Thirty Million Dollars) when [Orange Pelican] executed the Redemption Agreement."

¶ 33    Orange Pelican's third count, fraudulent concealment, did not include allegations of a fiduciary relationship. In this count, Orange Pelican alleged: "46. Inoa, independently and on behalf of Maestro as its managing member, had a duty to disclose [] material facts to [Orange Pelican]," including information about Maestro's valuation and the fact that Maestro was in buy-out negotiations.

¶ 34    With respect to all three counts, Orange Pelican argues that its redemption agreement with

Maestro differs substantively from the *Walworth* agreement in that it does not include antireliance language that would bar any of Orange Pelican's claims. According to Orange Pelican, in the *Walworth* agreement, the stockholder expressly warranted that (1) it had received all information necessary to make a decision about selling, and (2) no one representing the buyer had made any representation or warranty except those stated in the agreement. Orange Pelican contends, however, that it made neither of those representations or warranties in its redemption agreement with Maestro. Orange Pelican downplays section 3.01 of the redemption agreement, in which Orange Pelican's representations included that the stock valuation was agreed to "on the basis of [Maestro's] internal valuation" and that Orange Pelican "had a full and fair opportunity to conduct an independent investigation." Orange Pelican argues that its statements were not a representation that Maestro's managers had made no representations or warranties other than those set forth in the agreement, which distinguishes *Walworth*.

¶ 35    The Maestro defendants respond that examining the redemption agreement as a whole shows that, although the *Walworth* agreement and the Orange Pelican agreement are not word-for-word identical, they clearly use statements to the same effect, and that Orange Pelican cannot avoid the consequences of the antireliance terms. We agree with the Maestro defendants.

¶ 36    Delaware's public policy is to enforce contractually binding, written disclaimers of reliance on representations outside of a final sale agreement. *Id.* at ¶ 58. According to the Supreme Court of Delaware:

> " '[A] party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a "but we did rely on those representations" fraudulent

inducement claim. The policy basis for this line of cases is \*\*\* quite strong. If there is a public policy interest in truthfulness, then that interest applies with more force, not less, to contractual representations of fact. Contractually binding, written representations of fact ought to be the most reliable of representations, and a law intolerant of fraud should abhor parties that make such representations knowing they are false.

To fail to enforce non-reliance clauses is not to promote a public policy against lying. Rather, it is to excuse a lie made by one contracting party in writing—the lie that it was relying only on contractual representations and that no other representations had been made—to enable it to prove that another party lied orally or in a writing outside the contract's four corners. For the plaintiff in such a situation to prove its fraudulent inducement claim, it proves itself not only a liar, but a liar in the most inexcusable of commercial circumstances: in a freely negotiated written contract. Put colloquially, this is necessarily a "Double Liar" scenario. To allow the buyer to prevail on its claim is to sanction its own fraudulent conduct.' " *Id.* (*quoting Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1057-58 (Del. Ch. 2006)).

¶ 37   With regard to the *Walworth* language concerning the receipt of all information, numerous sections of Orange Pelican's redemption agreement, by themselves or together, lead to the same result reached in *Walworth*. Orange Pelican represented and warranted in section 3.01 that it agreed to the Agreed Valuation and further expressly represented that it "had a full and fair opportunity to conduct an independent determination of the fair market value of the Company and/or the Subject Interest." Orange Pelican also expressly acknowledged in section 3.01 that "the Company has made no representations or warranties as to the accuracy or methods resulting in the Agreed

Valuation." Section 4.01 of the redemption agreement addressed Maestro's representations and warranties and provides that, except for representations concerning its authority to enter into the redemption agreement, the redemption agreement did not violate or conflict with any laws, and that Maestro was a valid Delaware limited liability company in good standing:

> "[Neither] the Company or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of the Company, including any representation or warranty as to the accuracy or completeness of any information regarding the Company furnished or made available to Buyer, or as to the future revenue, profitability or success of the Company, or any representation or warranty arising from statute or otherwise in law."

¶ 38 " 'Delaware law does not require magic words; to disclaim reliance, and the specific language of an agreement may vary but still 'add up to a clear anti-reliance clause.'" *Id.*, at ¶ 53 (quoting *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 51 (Del. Ch. 2015)). In our opinion, there is no material difference between this redemption agreement language and the *Walworth* contract language that the supreme court determined "reveal[ed] a clear disclaimer of reliance by the plaintiff on extracontractual statements made by defendants." *Walworth*, 2022 IL 127177, ¶ 55; *see also Schrager v. Bailey*, 2012 IL App (1st) 111943, ¶ 34 (affirming that a nonreliance provision precluded the plaintiff from establishing that it justifiably relied on an alleged misrepresentation).

¶ 39 Like the plaintiff if *Walworth*, "if [Orange Pelican] had relied on statements made outside of the [redemption agreement] it should not have signed an agreement expressly stating that no such representations had been made." *Walworth*, 2022 IL 127177, ¶ 54; *see also Schrager*, 2012

IL App (1st) 111943, ¶ 22 ("[I]t is hardly justifiable for someone to rely on something that they have agreed not to rely on.") (citation and internal quotations omitted).

¶ 40    In addition, Orange Pelican admits that its argument regarding receiving information is based on the existence of "a fiduciary duty to do so," but, in our opinion, no such fiduciary duty existed here. Under Delaware law, absent a special relationship, "a party is under no duty to disclose facts of which he knows the other party is ignorant even if he knows the other party would consider the omitted facts material in determining its course of action in the transaction." *Id*., at ¶ 64 (citing *Prairie Capital*, 132 A.3d at 52). The supreme court made short shrift of any attempt to bring a claim based on active concealment under the facts alleged and contracts at issue in both *Walworth* and this case. "Because parties in an arm's-length contractual setting begin[] the process without any affirmative duty to speak, any claim of fraud' 'cannot start from an omission.' " *Id.* " '[T]herefore, contractual provisions that identify the representations on which a party exclusively relied define the universe of information that is in play for purposes of a fraud claim.' " *Id.* The "critical distinction is not between misrepresentations and omissions, but between information identified in the written agreement and information outside of it." *Id.*

> " ' "Every misrepresentation, to some extent, involves an omission of the truth...." [Citation.] Consequently, any misrepresentation can be re-framed for pleading purposes as an omission. If a plaintiff could escape a provision like [antireliance provisions] by re-framing an extra-contractual misrepresentation as an omission, then the clause would be rendered nugatory. When parties identify a universe of contractually operative representations in a written agreement, they remain in that universe. A party that is later disappointed with the written agreement cannot escape through a wormhole into an

alternative universe of extra-contractual omissions.' " *Id*., at ¶ 66 (quoting *Prairie Capital*, 132 A.3d at 52-53).

¶ 41    Therefore, " '[i]f the contract says that the buyer only relied on the representations in the four corners of the agreement, then that is sufficient.' " *Id.* at ¶ 67 (quoting *Prairie Capital*, 132 A.3d at 54-55). " 'The party may prove that the representations in the four corners of the agreement were false or materially misleading, but the party cannot claim that information it received outside of the agreement, which was not the subject of a contractual representation, contained material omissions.' " *Id.*

¶ 42    Orange Pelican's argument, whether framed as a fraudulent statement or an instance of active concealment, boils down to allegations that Maestro and Inoa refused to turn over financial information about Maestro's value and that it was in buy-out negotiations. Orange Pelican, however, with its significant ownership of the company and its two seats on the company's five-seat board of directors, had the opportunity to require disclosure of whatever material it wanted prior to closing on the sale of its membership interests. Orange Pelican has alleged that it repeatedly asked for the financial information, to no avail, but Orange Pelican was not powerless in the transaction and cannot avoid the consequences of the antireliance terms. Orange Pelican entered into a freely negotiated written contract.

¶ 43    Furthermore, the redemption agreement contains an integration clause that bars all of Orange Pelican's claims. The *Walworth* agreement included the following integration language:

"This Agreement contains the complete agreement and understanding between the parties as to the subject matter covered hereby and supersedes any prior understandings, agreements or representations by or between the parties, written or oral, which may have

related to the subject matter hereof in any way." *Walworth*, 2022 IL 127177, ¶ 14.

¶ 44 Orange Pelican's integration clause was even more robust than the above. Section 12.03 of the redemption agreement provided:

> "Entire Agreement; Third-Party Beneficiaries. This Agreement (including exhibits incorporated herein) and the Transaction Documents contain the entire agreement between the Parties with respect to the subject matter hereof, supersedes all prior or contemporaneous discussions, communications, or agreements, expressed or implied, written or oral, by or between the Parties, and there are no agreements, understandings, representations or warranties between the Parties with respect to the subject matter hereof other than those set forth or referred to herein."

¶ 45 The fraudulent concealment allegations that Orange Pelican set out as its third and final counterclaim were properly dismissed.

¶ 46 For these reasons, we affirm the dismissal of Orange Pelican's three counterclaims.

¶ 47 Orange Pelican next argues that if we are persuaded to reinstate its counterclaims, then we should reverse, as premature, the entry of summary judgment as to count II of the Maestro defendants' first amended complaint. The Maestro defendants alleged that section 10.01 of the Redemption Agreement obligates Orange Pelican to indemnify attorney fees and costs. Since we have rejected Orange Pelican's main appellate argument, we need not reach this conditional argument.

¶ 48 We affirm the judgment of the circuit court.

¶ 49 Affirmed.